**Ninth Circuit Court of Appeals No. 23-313**
**District Court Number CR 22-33-M-DWM**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**
**Plaintiff-Appellee,**

**-vs-**

**SHAWN LEE BUTTS,**
**Defendant-Appellant.**

---

**OPENING BRIEF OF DEFENDANT-APPELLANT**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

HONORABLE DONALD W. MOLLOY
SENIOR UNITED STATES DISTRICT JUDGE, PRESIDING

RACHEL JULAGAY
Federal Defender, District of Montana
*JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
125 Bank Street, Suite 710
Missoula, MT 59802
(406) 721-6749
  *Counsel for Petitioner-Appellant

SUBMITTED: July 27, 2023

# **TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................ ii

TABLE OF AUTHORITIES ......................................................... iii

INTRODUCTION ........................................................................1

I.     JURISDICTION ................................................................2

II.    STATEMENT OF THE ISSUE ......................................3

III.   STATEMENT OF THE CASE ........................................4

      A.    Nature of the Appeal .........................................4

      B.    Course of the Proceedings..................................4

      C.    Disposition in the District Court .......................5

      D.    Bail Status.........................................................5

IV.   STATEMENT OF FACTS ..............................................5

V.    SUMMARY OF THE ARGUMENT ...........................13

VI.   ARGUMENT..................................................................14

      A.    *Bruen* established a two-part test for protecting Second Amendment rights. ...............................................14

      B.    *Bruen* revolutionized Second Amendment jurisprudence. .................15

      C.    Mr. Butts is part of the people protected by the Second Amendment. ......................................22

      D.    The government cannot eliminate Mr. Butts from the people. ...........26

E.    *Bruen* set forth a two-track analysis under its historical component ..31

    1.    Felon disarmament is a 20th century development. .................37

    2.    Founding era laws did not disarm felons. .................................41

        A.    State constitutional conventions. ....................................41

        B.    Loyalists, slaves, Indians and Catholics. ........................44

F.    Founding-era militia statutes confirm that felons enjoyed the right to keep and bear arms. .............................................................................47

G.    The district court erroneously considered itself bound by *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). .............................49

H.    The Second Amendment guarantees the right to possess guns for hunting.......................................................................................57

I.    As-applied, § 922(g)(1) violates Mr. Butts' Second Amendment rights. ..............................................................................60

VII.    CONCLUSION..............................................................................62

CERTIFICATE OF COMPLIANCE.......................................................63

STATEMENT OF RELATED CASES ....................................................64

CERTIFICATE OF SERVICE ...............................................................65

# TABLE OF AUTHORITIES

## <u>TABLE OF CASES</u>

*Atkinson v. Garland*,
  2023 WL 4071542 (7th Cir. 2023) ...........................................55, 56

*Board of Trustees of State University of New York v. Fox*,
  492 U.S. 469 (1989) ........................................................................60

*Denezpi v. United States*,
  142 S.Ct. 1838 (2022) ....................................................................29

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..................................................................passim

*Firearms Pol'y Coal. Inc. v. McCraw*,
  623 F. Supp. 3d 740 (N.D. Tex. 2022) ...................................47, 49

*Folajtar v. Attorney General of the United States*,
  980 F.3d 897 (3d Cir. 2020) ..........................................................25

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) ........................................................................60

*IBP, Inc. v. Alvarez*,
  546 U.S. 21 (2005) ..........................................................................24

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) .....................................25, 30, 42, 43

*Konigsberg v. State Bar of California*,
  336 U.S. 36 (1961) ..........................................................................15

*Mai v. United States*,
  974 F.3d 1082 (9th Cir. 2020) .......................................................60

*McDonald v. City of Chicago, Ill.*,
  561 U.S. 742 (2010)........................................................................15, 20, 24, 31

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) ........................................................................49

*New York Rifle and Pistol Association v. Bruen*,
  142 S.Ct. 2111 (2022)............................................................................passim

*N.R.A. v. A.T.F.*,
  700 F.3d 185 (5th Cir. 2012) ........................................................................37

*Pena v. Lindley*,
  898 F.3d 969 (9th Cir. 2018) ........................................................................53

*Range v. Attorney General United States of America*,
  69 F.4th 96 (3d Cir. 2023) ...................................24, 27, 29, 30-31, 45, 61, 62

*Silveira v. Lockyer*,
  328 F.3d 567 (9th Cir. 2003) ........................................................................59

*Spence v. Washington*,
  418 U.S. 405 (1974)........................................................................................60

*Stimmel v. Sessions*,
  879 F.3d 198 (6th Cir. 2018) ........................................................................26

*Teixeira v. County of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ........................................................................53

*United States v. Alaniz*,
  2022 WL 4585896 (D. Idaho 2022) ..............................................................56

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023) ..........................................14, 22, 31, 36, 55-56

*United States v. Bullock*,
  2023 WL 4232309 (S.D. Miss. 2023) ......................................................55, 62

v

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013) ...................................................................50

*United States v. Goins*,
2022 WL 17836677 (E.D. Ky. 2022) .........................................................28

*United States v. Harrison*,
2023 WL 1771138 (W.D. Okla. 2023) ...........................................27, 28, 46

*United States v. Jackson*,
69 F.4th 495 (8th Cir. 2023) ................................................................41, 45

*United States v. Jimenez-Shilon*,
34 F.4th 1042 (11th Cir. 2022) ............................................................24, 25

*United States v. Lindsay*,
634 F.3d 541 (9th Cir. 2011) ....................................................................55

*United States v. Meza-Rodriguez*,
798 F.3d 664 (7th Cir. 2015) ........................................................ 23-24, 26

*United States v. Perez-Gallan*,
2022 WL 16858516 (W.D. Tex. 2022) ......................................................30

*United States v. Phillips*,
827 F.3d 1171 (9th Cir. 2016) .............................................................52, 53

*United States v. Pierre*,
CR 22-20321-JEM (S.D. Fla. 2022) ..........................................................28

*United States v. Rahimi*,
61 F.4th 443 (5th Cir. 2023) ................................................42, 45, 46, 54, 56

*United States v. Reaves*,
CR 22-224-HEA (E.D. Mo. 2023) .............................................................30

vi

*United States v. Rodman*,
   776 F.3d 638 (9th Cir. 2015) ...........................................................................14

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ..................................................................42, 51

*United States v. Torres*,
   789 Fed. Appx. 655 (9th Cir. 2020) .............................................................53

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990)........................................................................................23

*United States v. Wells*,
   20 F.4th 580 (9th Cir. 2022) ..........................................................................55

*United States v. Vongxay*,
   594 F.3d 1111 (9th Cir. 2010) ............................................................ 11, 49-57

*United States v. Younger*,
   398 F.3d 1179 (9th Cir. 2005) .......................................................................53

## STATUTES AND RULES

### United States Code

18 U.S.C. § 922(a)(6) ...........................................................................5

18 U.S.C. § 922(g)(1) ...................................................................passim

18 U.S.C. § 3231 ................................................................................2

28 U.S.C. § 1291 ................................................................................3

### Federal Statutes

Federal Firearms Act of 1938, 52 Stat. 1250 (1938) ("FFA") ..........................39, 40

Omnibus Crime Control & Safe Streets Act of 1968, 82 Stat. 197 (1968) .............40

Firearm Owners' Protection Act, 100 Stat. 449 (1986) ............................................40

### New York Statutes

Penal Law §400.00(2)(f) ........................................................................51

### Texas Statutes

General Laws § 1 (1871) ........................................................................32

### Federal Rules of Criminal Procedure

Rule 11(a)(2) ........................................................................................3

Rule 32 ................................................................................................3

### Federal Rules of Appellate Procedure

Rule 4(b) ..............................................................................................3

## United States Sentencing Guidelines

U.S.S.G. § 2K2.1(b)(2) ............................................................12

## United States Constitution

Article III, § 2, Cl. 1 .............................................................2

Second Amendment ...........................................................passim

## Pennsylvania Constitution (Historic)

Section 43 (1776) ...............................................................57

## Other Sources

Blackstone, W.
    *Commentaries on the Laws of England* (1769) ..............................................59

Churchill, R.
    *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139 (2007).......................................37, 45, 46

Dyche, T. & Pardon, W.
    *A New General English Dictionary* (14th ed. 1771) ....................................25

Elliott, J.
    *The Debates in the Several State Conventions of the Federal Constitution* (2d ed. 1936) ......................................................41, 44

Frassetto, M.
    *Firearms and Weapons Legislation up to the Early 20th Century* (2013)....38

Greenlee, J.
    *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020).......................................41, 42

Halbrook, S.
　　*The Founders' Second Amendment* (2008) ....................................................46

Johnson, S.
　　*A Dictionary of the English Language* (1766) .............................................25

Larson, C.
　　*Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1372 (2009)..38, 42

Lund, N.
　　*The Second Amendment, Heller, and Originalist Jurisprudence*
　　56 UCLA L. Rev. 1343 (2009)................................................................38, 39

Malcolm, J.
　　*To Keep and Bear Arms: The Origins of an Anglo-American Right*
　　Harvard University Press (1996) ............................................................45, 58

Marshall, C.
　　*Why Can't Martha Stewart Have a Gun?*
　　32 Harv. J.l. & Pub. Policy 695 (2009) ......................................38, 42, 58, 59

Office of Legal Counsel
　　*Whether the Second Amendment Secures an Individual Right*
　　28 Op. O.L.C. 126 (2004)..............................................................................58

Rawle, W.
　　*A View of the Constitution of the United States of America*
　　(2ed. 1829)......................................................................................................59

Rosenthal, L.
　　*The Limits of Second Amendment Originalism and the Constitutional Case*
　　*For Gun Control*, 92 Wash. U. L. Rev. 1187 (2015) ...................................39

Scalia, A.
　　*The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989)..........49

Schwartz, B.
　　*The Bill of Rights: A Documentary History* (1971)......................................42

Winkler, A.
   *Heller's Catch-22*, 56 UCLA L. Rev. 1551 (2009)........................................38

**Ninth Circuit Court of Appeals No. 23-313**
**District Court Number CR 22-33-M-DWM**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**
**Plaintiff-Appellee,**

**-vs-**

**SHAWN LEE BUTTS,**
**Defendant-Appellant.**

---

**OPENING BRIEF OF DEFENDANT-APPELLANT**

---

## INTRODUCTION

The Supreme Court's decision in *New York Rifle and Pistol Association v. Bruen* fundamentally redefined Second Amendment law, rendering presumptively unconstitutional all laws that burden firearm-possession conduct covered by the amendment's text. Shawn Butts engaged in precisely such protected conduct, possessing firearms in his home for lawful, permitted self-defense and hunting purposes. Yet he was criminally prosecuted for that possession because of a 17-yearsold, nonviolent criminal conviction for making a false statement in a firearm purchase document.

The Second Amendment presumptively protects Mr. Butts' possession of firearms in his home for hunting and self-defense purposes. The government cannot meet its constitutional burden under *Bruen* to show a historical tradition of firearm regulation robust enough to justify permanently dispossessing him of his firearms based on stale conduct. Because the district court erred in concluding to the contrary – based on outdated pre-*Bruen* precedent irreconcilable with *Bruen*'s legal framework and mode of analysis – this Court should reverse the district court's denial of Mr. Butts' motion to dismiss the indictment against him as a violation of the Second Amendment.

## I. JURISDICTION

### A.     Statutory Basis of Subject Matter Jurisdiction of the District Court

The United States District Court for the District of Montana had jurisdiction over the original criminal action under Article III, Section 2, Clause 1 of the United States Constitution and 18 U.S.C. § 3231, because the United States charged Defendant-Appellant Shawn Lee Butts ("Mr. Butts") in the District of Montana with one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). ER-162.

**B.    Statutory Basis of Jurisdiction of the Court of Appeals**

Mr. Butts appeals from the judgment imposed by the district court.  ER-15.

This Court has appellate jurisdiction over this appeal pursuant to 28 U.S.C. § 1291

and Rule 32 of the Federal Rules of Criminal Procedure.

**C.    Appealability**

Mr. Butts pled guilty pursuant to a plea agreement that preserved his right to

appeal the order denying dismissal of his case, which the district court authorized.

Fed. R. Crim. P. 11(a)(2); ER-90.  The district court imposed judgment on March 2,

2023.  ER-15.  Mr. Butts filed his Notice of Appeal on March 6, 2023, in compliance

with Rule 4(b) of the Federal Rules of Appellate Procedure.  ER-176.

## II.  STATEMENT OF THE ISSUE

Did the district court err when it denied Mr. Butts' motion to dismiss by

concluding the government had met its burden under *New York Rifle and Pistol*

*Association v. Bruen*, to show 18 U.S.C. § 922(g)(1) comports with the Second

Amendment as applied to a felon like Mr. Butts, who constructively possessed

hunting firearms, 17 years after his alleged predicate nonviolent felony conviction

for making a false statement in a firearms transaction.

## III.  STATEMENT OF THE CASE

**A.    Nature of the Appeal**

Mr. Butts appeals the denial of his motion to dismiss.

**B.    Course of the Proceedings**

Mr. Butts was charged by complaint, arrested, and appeared on May 25, 2022. He was detained pending a detention hearing.  Following a detention hearing on May 26, 2022, Mr. Butts was released.

Mr. Butts was indicted on June 24, 2022, with one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  ER-162.

Mr. Butts filed a motion to dismiss on October 5, 2022.  CR 26.  The district court held a hearing on the motion on October 31, 2022, and denied his motion that same day.  ER-4; ER-114.

Mr. Butts filed a motion to change plea on November 3, 2022.  CR 38.  He submitted a plea agreement on November 4, 2022, which reserved his right to appeal the district court's denial of his motion to dismiss.  ER-89.

On November 7, 2022, the district court convened a change of plea hearing. ER-47.  The district court accepted Mr. Butts' guilty plea.

On March 2, 2023, the district court sentenced Mr. Butts to three years probation and a fine of $1,000.00.  ER-15.

4

This appeal follows.  ER-176.

**C.      Disposition in the District Court**

The district court sentenced Mr. Butts to three years probation and a $1,000.00 fine. ER-15.

**D.      Bail Status**

Mr. Butts is released and serving a sentence of probation.

## IV.  STATEMENT OF FACTS

<u>Prior Convictions</u>

On December 2, 2004, Mr. Butts was convicted by the State of Montana of one felony count of criminal endangerment, one felony count of criminal mischief, and two misdemeanor counts of resisting arrest.  PSR ¶ 40.  The offense conduct centered on resisting arrest after reports of Mr. Butts allegedly firing shots at another residence.  *Id*. He received a five-year deferred sentence.  *Id*.  His deferred sentence was revoked on March 10, 2005, and replaced by a sentence of ten years imprisonment, all suspended.  *Id*.

On August 19, 2005, Mr. Butts was indicted with a single count of false statement during firearms transaction, in violation of 18 U.S.C. § 922(a)(6).  PSR ¶ 41.  The indictment alleged Mr. Butts did not disclose his prior felony convictions when attempting to purchase a firearm.  *Id*.  Mr. Butts pled guilty to the offense, and

on April 20, 2006, was sentenced to 30 months imprisonment, concurrent to his State of Montana sentence, followed by three years supervised release.  Mr. Butts successfully discharged from his supervised release term on July 11, 2011.  PSR ¶ 41.

The indictment in this case identified that false statement conviction as the predicate felony prohibiting Mr. Butts' possession of a firearm.  ER-162–163.

Since his 2005 conviction, Mr. Butts received a first offense, misdemeanor DUI conviction in 2011.  PSR ¶ 42.

## Investigation

On March 16, 2022, ATF received a report regarding gunfire coming from Mr. Butts' property in Kila, Montana.  ER-104; ER-166.   The reporting party informed ATF that they understood Mr. Butts to be prohibited from possessing firearms.  ATF confirmed Mr. Butts had a prior felony conviction. ER-104. ATF investigators located a metal target, outside Mr. Butts' property, with apparent bullet holes.  ER-166.  In May 2022, ATF received two more reports regarding gunfire coming from Mr. Butts' property.  *Id*.

The investigating ATF agent contacted Montana Fish Wildlife and Parks and learned Mr. Butts had purchased conservation hunting licenses in Kalispell, Helena and Whitefish, Montana, every year from 2011 to 2021.  ER-161.

6

The ATF obtained a search warrant for Mr. Butts' residence and vehicles. ER-166–167. Immediately prior to the search, Mr. Butts made a statement to the investigators that three firearms were on the property, two in a camper and one in his house. ER-104. Mr. Butts explained the two guns in the camper belonged to a friend, Dave Scherping, and that the .22 rifle in his residence was a childhood gift from his father. *Id*. An agent reported Mr. Butts further admitted to using the .22 rifle for target and gopher shooting. *Id*.; *but see* PSR ¶ 25, ER-76 (Mr. Butts' father, not Mr. Butts, shot the .22 rifle).

ATF executed the search warrant, and found a Ruger .44 magnum caliber revolver and a Remington .308 caliber rifle inside the camper, along with assorted ammunition for both firearms. ER-104–105; 167–168. Investigators also found a Remington .22 caliber rifle inside Mr. Butts' residence, along with .22 ammunition. *Id*.

<u>District court proceedings</u>

Mr. Butts was arrested and appeared in district court on May 25, 2022, to answer a complaint. He was detained pending a detention hearing set for the next day. Following the May 26, 2022, detention hearing, Mr. Butts was released on conditions.

On June 24, 2022, the grand jury issued an indictment, charging Mr. Butts with one count of being a prohibited person in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). ER-162. The Indictment identified Mr. Butts' 2006 federal conviction for false statement as the predicate felony prohibiting his possession of firearms and ammunition. Mr. Butts was arraigned on July 26, 2022.

Mr. Butts filed a motion to dismiss on October 5, 2023. The brief included exhibits, ER-158–161, which showed the stump and target used for target practice and also Mr. Butts' annual hunting and conservation licenses from 2011 to 2021. ER-161.

On October 28, 2022, Mr. Butts filed the affidavit of John Way, the affidavit of David Scherping, and the declaration of Joe Gaffney. ER-143. John Way attested he has owned a "fly fishing store, a fishing outfitting business and a hunting outfitting business, all since 1996." ER-146. He is also Chairman of the Montana Board of Outfitters, the purpose of which "is to regulate and license guides and outfitters for the State of Montana." ER-147.

In his affidavit, Mr. Way informed that when he hunts, he always carries "a .45 caliber semi-automatic as my secondary firearm, my primary weapon being my

.308 hunting rifle." *Id*. He has seen many grizzly bears over the past 20 years. *Id*. Twice, grizzlies charged him, once within six yards of him. *Id*.

Mr. Way attested the .22 is used for training, shooting, and developing shooting skills. *Id*. "[T]he .22 and .308 calibers are the two most popular calibers ever developed for sportsmen." ER-148. He further informed: "The .44 magnum caliber sidearm is a very popular [gun] in Montana for hunters to carry for self-defense. . . . I consider it best practice for Montana hunters to carry a sidearm for self-defense." *Id*. "Standard practice for all my guides that work for me is to carry a sidearm for self-defense." *Id*.

David Scherping's affidavit described his working relationship with Mr. Butts, and confirmed that the seized .308 rifle and .44 magnum pistol belonged to him, and that he left them in Mr. Butts' camping trailer following a hunting trip they had taken together in the fall of 2021. ER-150–151. When he hunts, he "customarily carr[ies] that [.44] revolver for self-defense purposes in the event of an encounter with a predator." ER-151. In the fall of 2021, he "left the rifle and the revolver in the interior of Mr. Butts' camper trailer." *Id*.

Joe Gaffney is the investigator for the Federal Defenders of Montana. His declaration described his conversation with Mr. Butts' father, Dan Butts. Dan Butts is 82 years old. ER-155. Dan Butts originally bought the .22 rifle for Mr. Butts

9

when Mr. Butts was twelve years old. ER-156. Dan Butts took possession of the .22 rifle when Mr. Butts was incarcerated. ER-155. In April or May of 2022, Dan Butts "inadvertently left the rifle at Shawn's residence." ER-156.

Dan Butts informed the PSR writer that "when they [the neighbors] saw him [Dan Butts] shooting target's on the defendant's property, they called law enforcement and said it was the defendant." PSR ¶ 55. Mr. Butts reported to the PSR writer "that in addition to his father shooting on his property, he allowed friends on his property to shoot." *Id*.

Mr. Butts corroborated his constructive possession of the three hunting firearms owned by his father (.22 rifle) and Mr. Scherping (.44 handgun and .308 rifle):

> These firearms and ammunition that were found to be in constructive possession of myself, were used for hunting big game animals in a legal manner, and for the purpose of target practice for the reason of ethical hunting practices.
>
> I was in constructive possession of these firearms and ammunition because I took a friend and coworker on a hunting trip. I was guiding my friend in an area that I know very well. My friend was trying to harvest an elk, as I am blessed to have a camper, we stayed in my camper trailer, upon returning home my friend left his firearms in my camp trailer. Regarding my father's .22, he took possession of all of my property when I went to prison, including the .22. In 2013, I purchased my place in Kila, and my father would bring the .22 rifle with him, shooting targets and gophers on my property. I asked him to help me with a project, and he inadvertently left the .22 rifle at my residence.

PSR ¶ 25.

On October 31, 2022, the district court convened a hearing on Mr. Butts' motion to dismiss.

Mr. Butts argued that § 922(g)(1) violated the Second Amendment under *Bruen*, both facially and as applied to his conduct of possessing hunting firearms. ER-115–134. Neither the government, nor the district court, disputed that "Mr. Butts possessed these firearms in his house . . . . [and] these firearms are classic hunting firearms." ER-123. Mr. Butts emphasized "the very unique facts for this type of case nationally." ER-124. While maintaining the facial challenge, Mr. Butts emphasized: "These are very unique facts which support our as-applied challenge." ER-131.

The district court heard argument on the challenge. ER-134–140. The district court issued its order denying Mr. Butts' motion. ER-4. It ruled this Court's pre-*Bruen* authority, *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), which upheld § 922(g)(1), survived *Bruen*. ER-11–12.

<u>Sentencing</u>

During Mr. Butts' guilty plea, he clarified his dad, not him, shot the .22. ER-76. He repeatedly admitted his constructive possession, ER-54, 56. 72-73, which the court acknowledged. ER-74.

11

At sentencing, the court applied the "sporting exception" in U.S.S.G. § 2K2.1(b)(2), to which the government agreed, resulting in a 0-to-6 months Guidelines range. PSR ¶29; ER-35–36. The court noted Mr. Butts was "successfully participating in supervised release, and, in addition, has dealt with anger management issues." ER-34.

The court acknowledged Mr. Butts' full compliance with pretrial release.

THE COURT:    His pretrial release, as Mr. Rhodes indicated, was restricted, but he has abided completely, in every respect, by the conditions that were set by the Court, including the payment of contribution toward attorney's fees.

ER-35. Mr. Butts was subject to stringent pretrial release conditions, including full abstention from alcohol and drug and alcohol testing.[1] Mr. Butts was also prohibited from going to his home in Kila, where the firearms were found, without the express permission of his supervising pretrial services officer. CR 9-2. Mr. Butts fully complied with all of the court's conditions, including that unusually restrictive condition. ER-35; PSR ¶ 11.

The court discussed the firearms:

THE COURT:    [T]here's no indication that the firearms that Mr. Butts had in his possession or was using were anything other than for sporting purposes, and I gather shooting gophers is considered sporting.

\*\*\*

---

[1] The court released Mr. Butts on twelve conditions. CR 9-2.

12

I would not categorize Mr. Butts using a .22 rifle to shoot gophers or target shoot on his own property would be a significant serious offense.

ER-35–36.

The court emphasized: "Mr. Butts has a respect for the law. And the presentence report and all the factors that are set forth in there, his personal history, reflect somebody who is likely a good citizen." ER-36.

The court observed the public did not need to be protected from Mr. Butts:

THE COURT: There's a need to protect the public from further crimes by Mr. Butts. I don't think that's an issue. His last substance abuse appears to be in 2011, and since that time he's basically abstained from the use of alcohol and any controlled substances.

ER-36–37.

The district court imposed a sentence of three years probation, which included a two month period of home confinement and 300 hours of community service, and a $1,000.00 fine. ER-37–42.

## V. SUMMARY OF THE ARGUMENT

Mr. Butts appeals from the denial of his motion to dismiss. Under *Bruen*, the Second Amendment protects Mr. Butts' right to possess hunting firearms in his home. To displace that right, the government must establish a 1791-centered historical tradition of firearm dispossession for a decades-plus old, non-violent false

13

statement conviction.  Because the government cannot meet this burden, this Court should reverse the district court.

## VI. ARGUMENT

Motions to dismiss are reviewed de novo.  *United States v. Rodman*, 776 F.3d 638, 641-42 (9th Cir. 2015).

**A.**   ***Bruen* established a two-part test for protecting Second Amendment rights.**

The Second Amendment guarantees:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

For centuries, the Supreme Court seemingly left the Second Amendment to lie dormant.  That neglect changed this century.  "Although the Amendment has historical underpinnings in English and early American law, the Supreme Court only began some fifteen years ago, in *District of Columbia v. Heller*, 554 U.S. 570 (2008), to define the contours of that right."  *United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023).

Last year, the Supreme Court "adopted the following two-part test:

[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, ... the government must demonstrate that the

14

> regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 1128 (quoting *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 n.10 (1961))).

## B.   *Bruen* revolutionized Second Amendment jurisprudence.

*Bruen* marks a dramatic shift in Second Amendment law.  Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms.   The Supreme Court noted, "the Court of Appeals have coalesced around a two-step framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Bruen*, 142 S.Ct. 2126.  *Bruen* disavowed the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S.Ct. at 2127.

*Bruen* instructed courts, instead, to consider only "constitutional text and history."  142 S.Ct. at 2128-29.  If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen*, "the Constitution presumptively protects that conduct." *Id*. at 2129-30.  To rebut the presumption, the government must show

that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id*. This test is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted. *Id*.

The *Bruen* analysis begins by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id*. at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id*. Answering this question in *Bruen* was straightforward: New York required applicants to demonstrate "proper cause" to open carry outside the home, i.e., " a special need for self-protection distinguishable from that of the general community." *Id*. at 2122-23. The Court held the Second Amendment protects the right to possess firearms in public, explaining: "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id*. The Second Amendment "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement could pass constitutional muster only if the state overcame the presumption. *Id*. at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* instructed, "the government may not simply posit that [a] regulation promotes an important interest." *Id*. at 2126. "Rather, the government must demonstrate that the regulation is

16

consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*.

This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id*. at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id*. at 2132. If there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id*. at 2141 n. 11.

The Court explained: "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id*. at 2136 (emphasis in original). The relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791. *Id*. at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id*. at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id*. at 2136. Courts should not "rely on an ancient practice that had become

17

obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id*.

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id*. Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 18th century represent[s] a critical tool of constitutional interpretation." *Id*. But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id*. at 2137. Evidence from "the mid-to-late-19th century" provides little "insight into the meaning of the constitution in [1791]." *Id*. Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. *Id*. After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. (italics in original).

Because New York could not point to a robust tradition of regulation similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id*. at 2138-56. In reaching that conclusion, the Court staked certain guideposts for courts to follow. The Court explained the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended

18

to remedy – specifically, whether that problem is old new. "In some cases," as is the case here with a felon, the historical inquiry "will be fairly straightforward":

> when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id*. at 2131 (In short, if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today). That analysis is more fully developed *infra* at 31.

In "other cases," challenged statutes will "implicat[e] unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced approach." *Id*. at 2132. When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id*.; *see also id*. (directing courts to use "analogical reasoning" when confronting "present-day firearm regulations" that "were unimaginable at the founding"). Deciding "whether

19

a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id*.

In assessing analogues, the Court identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id*. at 2133 (citing *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) (*quoting Heller*, 554 U.S. at 599) (footnote omitted) (brackets added) (italics in original)).

The Court stressed the limits of reasoning by analogy: "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id*. "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. (emphasis in original).

Whether based on "distinctly similar" precursors or merely historical analogues, the "comparable tradition of regulation" must be robust. A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" do not

amount to a historical tradition. *Id*. at 2153, 2156. The Court expressed "doubt" that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. *Id*. at 2142. And in evaluating 19th-Century "surety laws" that New York argued were precursors to its "proper cause" requirement, the Court discounted two of those ten laws – which were closest to New York's – as unrepresentative. *See id*. at 2148 n.24. Moreover, even if certain statutes were widespread, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *See id*. at 2149 (dismissing surety laws because "respondents offer little evidence that authorities ever enforced [those] laws").

Finally, *Bruen* emphasized – repeatedly – that the burden falls on the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *See*, *e.g.*, *id*. at 2127, 2130. Courts "are not obliged to sift the historical materials for evidence to sustain [a] statute." *Id*. at 2150.

Applying this standard here, Mr. Butts has a presumptive right to keep and bear arms, and the government will not be able to show a historical tradition disarming him.

**C.**  **Mr. Butts is part of the people protected by the Second Amendment.**

The *Bruen* test begins by asking whether the Second Amendment's plain text covers the defendant's proposed course of conduct. In *Alaniz*, this Court summarized the step one analysis as:

> [D]etermining whether the challenger is "part of 'the people' whom the Second Amendment protects," whether the weapon at issue is "'in common use' today for self-defense," and whether the "proposed course of conduct" falls within the Second Amendment. *Id.* at 2134–35 (citing *Heller*, 554 U.S. at 580, 627, 128 S.Ct. 2783).

*Id.* (citing *Bruen*, at 2134-35 (citing *Heller*, 554 U.S. at 580, 627).

Mr. Butts constructively possessed rifles and a self-defense handgun used for hunting. *Bruen*, 142 S.Ct. at 2134-35. These guns constitute "arms." "The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. And the firearms are in common use today.

"[T]he Second Amendment's plain text covers [Mr. Butts'] conduct". *Bruen*, 142 S.Ct. at 2126. *Heller* defines "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession" – in short, to "have weapons". *Id.* at 582. That definition encompasses constructively possessing firearms on one's own property.

22

Finally, Mr. Butts is "part of 'the people' whom the Second Amendment protects. Bruen, 142 S.Ct. at 2134 (citing *Heller*, 554 U.S. at 580). *Bruen* cites *Heller* for the Second Amendment's expanse. "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.'" *Bruen*, 142 S.Ct. at 2156 (citing *Heller* without introductory signal). That expanse echoed *Heller* establishing "the people" (1) "unambiguously refers to all members of the political community, not an unspecified subset," (2) includes anyone who is "part of [the] national community," and (3) encompasses "all Americans." *Heller*, 554 U.S. at 580-81.

To begin, *Heller* explained that "the people" is a "term of art" that bears a uniform meaning in the First, Second, Fourth, and Ninth Amendments. *Id*. at 580. "'[Its uses] sugges[t] that "the people,"' as used across the Bill of Rights as well as in the preamble, "'refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Id*. 579-81 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Citing *Heller*, years ago, the Seventh Circuit held "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and should be interpreted "as consistent with the other amendments passed as part of the Bill of Rights." *United States v.*

*Meza-Rodriguez*, 798 F.3d 664, 669-70 (7th Cir. 2015). *See also Range v. Attorney General United States of America*, 69 F.4th 96, 103 (3rd Cir. 2023) (en banc).

The presumption of consistent meaning applies to the Bill of Rights because "the first ten amendments were adopted as a package" – that is, all together at the same time by the same Congress. *Meza-Rodriguez*, 798 F.3d at 670. It is a cardinal rule of interpretation "that identical words used in different parts of the same [law] are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).

There is "no principled way to carve out the Second Amendment" from the other Bill of Rights provisions and impose a different definition of "the people" in that amendment alone. *Id*. at 672; *see also United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022) (no "textual, contextual, or historical reason to think that the Framers understood the meaning of [the people] to vary from one provision of the Bill of Rights to another"). Interpreting "the people" differently under the Second Amendment would "subject [the Second Amendment] to an entirely different body of rules than the other Bill of Rights guarantees," which the Supreme Court has expressly forbidden. *McDonald*, 561 U.S. 742, 780 (2010).

Consistent with these rulings, founding era dictionaries define "people" as "those who compose a community," and extending to "every person." *See*, *e.g.*, 2

Samuel Johnson, A Dictionary of the English Language (1766) ("A nation; those who compose a community"), available at https://tinyurl.com/y95erjwf; Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) ("People" "signifies every person, or the whole collection of inhabitants in a nation or kingdom"), available at https://tinyurl.com/uk4b4fxd. *See Jimenez-Shilon*, 34 F.4th at 1044-45 (relying on founding-era dictionaries to construe "the people").

Applying *Heller*'s definition here, Mr. Butts is among "the people" whom the Second Amendment protects. Then-Judge Barrett, reading *Heller* to interpret "'the people' as referring to 'all Americans,'" noted that felons are not "categorically excluded from our national community." *Kanter v. Barr*, 919 F.3d 437, 451-53 (7th Cir. 2019) (Barrett, J., dissenting). Thus, as Judge Bibas observed, felons "are part of 'We the People of the United States.' U.S. Const. pmbl. So they, too, share in the Second Amendment 'right of the people to keep and bear Arms,' subject only to the historical limits on that right." *Folajtar v. Attorney General of the United States*, 980 F.3d 897, 912-13, 923 (3d Cir. 2020) (Bibas, J., dissenting).

It is hard to understand how the government truly believes an American citizen is not part of the people protected by the Constitution.

25

**D.      The government cannot eliminate Mr. Butts from the people.**

Mr. Butts anticipates the government will contend that *Heller* defined the Second Amendment right as "belonging to 'law-abiding, responsible citizens.'" What *Heller* actually said is that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. By beginning this passage with "whatever else it leaves to future evaluation," *Heller* made clear that its reference to "law-abiding, responsible citizens" established a Second Amendment floor, not a ceiling. The Court held that law-abiding, responsible citizens clearly do have a right to possess firearms, but it did not address whether – much less rule out the conclusion that – other people have that right, too. Rather, it expressly left that question "to future evaluation." *Heller*'s "law-abiding" statement was not meant to amend, sub silentio, its holding that "the people" comprise "all Americans." *Id*. at 580.

The Seventh Circuit recognized *Heller*'s "'law-abiding citizens' . . . passage[] did not reflect an attempt to define the term 'people.'" *Meza-Rodriguez*, 798 F.3d at 669. Rather, *Heller* merely "established the Second Amendment applies to law-abiding and peaceable citizens at the very least." *Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018) (emphasis added). *Heller*'s "law-abiding" language does not

26

"demarcate [the Second Amendment's] outer limit" or "exclude[]" anyone from the Amendment's coverage, *id.*; it merely establishes that certain people do fall within the Amendment's reach. *See also Range*, 69 F.4th at 104.

*Bruen* confirms this reading of *Heller*. The passage from *Heller* cited above references law-abiding, responsible citizens' right to use arms "in defense of hearth and home." If that passage were meant to demarcate the outer edges of the Second Amendment right, then even law-abiding, responsible citizens would have no right to carry firearms outside the home. But *Bruen* held the Second Amendment right does extend outside the home, and the Court in *Bruen* gave no hint that it believed it was contradicting *Heller* in that regard. Thus *Heller*'s "lawabiding, responsible citizens" language cannot be read as a limitation on the Second Amendment.

*Bruen* describes its holding by using the term "law-abiding." *See*, *e.g.*, *Bruen*, 142 S. Ct. at 2156. But "that description can't be read as breaking new ground with respect to who make up 'the people' protected by the Second Amendment." *United States v. Harrison*, — F.Supp.3d —, 2023 WL 1771138, at *4 n.20 (W.D. Okla. Feb. 3, 2023). *Bruen* repeated the "law-abiding" designation because the petitioners in that case alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of petitioners' license applications violated the Constitution." *Bruen*, 142 S.

27

Ct. at 2124-25. "The issue of whether a non-law-abiding citizen qualifies for Second Amendment protection was not before the Court," *United States v. Goins*, — F.Supp.3d —, 2022 WL 17836677, at *5 (E.D. Ky. Dec. 21, 2022), so *Bruen*'s reference to the petitioners as "law-abiding" is, "at best, . . . dicta." *Harrison*, 2023 WL 1771138, at *4 n.20.

*Bruen* reaffirmed "*Heller*'s holding that 'the people' includes 'all members of the political community,' not just 'an unspecified subset,'" and *Bruen*'s "reference in dicta to 'law-abiding citizens' cannot possibly be read as overturning the very holding upon which it relies." *Id.*; *see also United States v. Pierre*, No. CR 22-20321-JEM, ECF No. 53 at 17 (S.D. Fla. Nov. 28, 2022) ("[I]t is no surprise that [*Bruen*] used the term 'law-abiding' because that was the factual scenario the Court was considering. Indeed, there would have been no reason for the Court in *Bruen* to address or even consider whether non-law-abiding citizens were part 'of the people.' It did not, and *Bruen*'s references to 'law abiding' do not support the Government's position.").

To the contrary, *Bruen* reaffirmed *Heller*'s conclusion that the Second Amendment right belongs to "'all Americans.'" *Bruen*, 142 S. Ct. at 2156. *Bruen* held "that ordinary, law-abiding citizens have [the] right to carry handguns publicly for their self-defense." *Id.* at 2122. If the word "law-abiding" in that sentence limits

the Second Amendment's scope, then the word "ordinary" must do so, too. But surely the government does not believe extraordinary citizens lack Second Amendment rights. It cannot be fundamental law that the Supreme Court meant to exclude anyone deemed not ordinary – a term with no discernible meaning – from exercising a fundamental, enumerated constitutional right.

As *Heller* made clear, "[i]t is inconceivable that [the Supreme Court] would rest [its] interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued." *Heller*, 554 U.S. at 625 n.25.  *See Denezpi v. United States*, — U.S. —, 142 S. Ct. 1838, 1847–48 (2022) (explaining that stray statements "[r]ead in isolation ... cannot overcome the holdings of our cases, not to mention the text of the Clause").

In addition to being at odds with authority, text, and established canons of construction, defining "the people" by reference to a vague and malleable "law abiding" standard suffers from a lack of administrability that will bedevil courts for years to come and necessarily devolve into "interest balancing." *Range*, 69 F.4th at 103 ("'law-abiding, responsible citizens' is as expansive as it is vague").  To the extent the "law-abiding" standard excludes those with felony convictions, it amounts to the very judicial deference to legislative interest-balancing *Bruen* rejected. 142 S. Ct. at 2129-31.

Using the "law-abiding" test at *Bruen*'s first step ("plain text") "collapses the *Bruen* analysis and risks subjecting the Second Amendment to legislative fiat." *United States v. Reaves*, CR 22-224-HEA (E.D. Mo., Jan. 9, 2023). Moreover, defining "law-abiding and responsible" as excluding those with felony convictions would require judges to make a judicial determination about the type and transience of wrongdoing that excludes someone from "the people": an approach that would (again) require the very "judge-empowering 'interest-balancing'" *Bruen* rejected. *Bruen*, 142 S.Ct. at 2129. *See Kanter*, 919 F.3d at 452 (Barrett, J., dissenting) ("[t]o say that certain people fall outside the Amendment's scope" means that "a person could be in one day and out the next"); *United States v. Perez-Gallan*, — F.Supp.3d —, 2022 WL 16858516 (W.D.Tex. 2022) (restricting "the people" to "law-abiding" could absurdly strip Second Amendment rights from the speeding driver and the shop-owner who forgets to post a "wet floor" sign).

Judges lack "'the power to decide on a case-by-case basis whether the right is really worth insisting upon.'" *Id*. (quoting *Heller*, 554 U.S. at 634) (emphasis in original). Relatedly, because *Heller* instructs that "the people" should be interpreted consistently across the Bill of Rights, post-*Bruen* decisions have recognized that Second Amendment protections extend to non-law-abiding people, even those who have been convicted, like Mr. Butts, of a false statement felony. *See*, *e.g.*, *Range*,

30

69 F.4th at 98 ("We agree with Range that, despite his false statement conviction, he remains among 'the people' protected by the Second Amendment.").[2]

Mr. Butts, a born and raised American and Montanan, is part of the people.

**E.** ***Bruen*** **set forth a two-track analysis under its historical component.**

Mr. Butts is part of the people. He constructively possessed weapons for hunting. And that constructive possession was in his house and camper – locations at the core of the Second Amendment's individually-focused right to keep and bear arms. *Heller*, 554 U.S. at 628 (nothing that "the home" is "where the need for defense of self, family, and property is most acute").

Because *Bruen*'s "first step is satisfied, we proceed to *Bruen* step two," at which to survive constitutional challenge, "the government must produce representative analogues to demonstrate that the challenged law is consistent with a historical tradition of regulation." *Alaniz*, 69 F.4th at 1128 (citing *Bruen*, 142 S.Ct. at 2131-33).

---

[2]The Third Circuit reached this conclusion for four reasons: criminal histories were not at issue in *Heller*, *McDonald*, and *Bruen*, so "their references to 'law-abiding responsible citizens' were dicta"; excluding a felon from "the people" would exclude him from other Constitutional rights vested in "the people"; individuals with Second Amendment rights can still lose those rights; and "'law-abiding, responsible citizens' is as expansive as it is vague." *Id.* at 102.

31

As overviewed *supra* at 19, in *Bruen*, the Supreme Court explained the standard for reviewing historical regulation depends on what kind of problem a statute is intended to address –specifically, whether that problem is old or new. *Id*. at 2131-32. Old problems are "general societal problems that ha[ve] persisted since the 18th century." *Id*. at 2131. In contrast, new problems are those involving "unprecedented societal concerns or dramatic technological changes" that were "unimaginable at the founding." *Id*. at 2132. Therefore, courts faced with a Second Amendment challenge must identify the problem at which the law was aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes." *Id*. at 2132. Only then will the court know which approach to employ.

When the challenged law addresses an old problem, as here, the test is "fairly straightforward"; the government must identify a tradition of "distinctly similar" laws from the founding era. *Id*. The standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id*. at 2153 (citing 1871 Tex. Gen. Laws § 1). This

32

"reasonable grounds" requirement was essentially identical to the New York courts' interpretation of that state's proper-cause standard. *See id*. at 2123-24.

*Bruen* also noted that "*Heller* . . . exemplifies th[e] kind of straightforward historical inquiry" demanded by the "distinctly similar" test. *Id.* at 2131. *Heller* confirms that the standard is a strict one. When assessing the "total[] ban[]" on handgun possession at issue in *Heller*, the Supreme Court identified only two historical laws for comparison: a Georgia law and a Tennessee law, both of which prohibited the open carry of pistols. 554 U.S. at 628-29. *Bruen* and *Heller* both establish that the focus of the "distinctly similar" test is on historical laws that are nearly identical to the modern law.

When the challenged law addresses a new problem, the test is "more nuanced." *Bruen*, 142. S. Ct. at 2132. Courts must determine if the challenged modern law fits into a "relevantly similar" tradition of historical laws. *Id*. The Supreme Court identified two "central considerations" for courts to determine if laws are relevantly similar: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 2133.

The "relevantly similar" test is less difficult for the government to satisfy because it allows for "analogical reasoning." *Id*. at 2132. But courts may use this test

only when the challenged law is aimed at a societal problem that was "unimaginable at the founding." *Id*. It is not available when the challenged law addresses an old problem – that is, one which "has persisted since the 18th century." *Id*. at 2131. When a law addresses an old problem, as here, it must satisfy the stringent "distinctly similar" test; there must be a historical tradition of laws that are virtually identical to the modern law. *Id*. at 2153; *Heller*, 554 U.S. at 628-29.

Regardless of whether the case calls for the stringent "distinctly similar" or the looser "relevantly similar" test, the relevant "historical tradition" is that which existed when the Second Amendment was ratified in 1791. *Bruen*, 142 S. Ct. at 2136. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id*. (emphasis in original). Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but should do so with care. *Id*. at 2131-32. *Bruen* cautioned that historical evidence long predating the Second Amendment's adoption might not elucidate its meaning "if linguistic or legal conventions changed in the intervening years." *Id*. at 2136. Courts should not rely on practices "that had become obsolete in England at the time of the adoption of the Constitution and never [were] acted upon or accepted in the colonies." *Id*.

Likewise, courts must not "giv[e] postenactment history more weight than it can rightly bear." *Id*. While evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation," historical evidence becomes less probative the farther forward in time from 1791. *Id*. at 2136-37. The Court recognized that "discussions of the right to keep and bear arms" that took place after the Civil War provided less insight into the Second Amendment's original meaning than earlier sources because they took place 75 years after its ratification. *Id*. at 2137.

Courts therefore should credit such later history to the extent it is consistent with prior practice but should otherwise afford it little weight. *See id*. After all, "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. (emphasis in original); *see also id*. at 2154 n.28 (ignoring "20th-century historical evidence" because it is too far removed from 1791).

Furthermore, the comparable tradition of regulation must be "well-established and representative." *Id*. at 2133; *see also id*. at 2137 (explaining that "a governmental practice" can guide [courts'] interpretation of an ambiguous constitutional provision" only if that practice "has been open, widespread, and unchallenged since

the early days of the Republic."). A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" are not enough to establish a historical tradition. *Id*. at 2153, 2156. For instance, the Supreme Court in *Bruen* doubted laws from three of the thirteen original colonies were enough to show a relevant tradition of regulating public carry of weapons. *See id*. at 2142.

Finally, as the Court stressed in *Alaniz*, 69 F.4th at 1128, *Bruen* emphasized that "the burden falls on [the government] to show that [a law] is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2135. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id*. at 2130 n.6. Accordingly, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id*. at 2150. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id*. at 2141 n.11; *see also id*. at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend" a law).

Here, the government must satisfy the demanding "distinctly similar" test because § 922(g)(1) addresses a "general societal problem" – i.e., felons' access to possess guns – that existed when the Second Amendment was ratified in the 18th

century.[3] To do so, the government must show a robust tradition of distinctly similar laws around 1791. *See Bruen*, 142 S. Ct. at 2153. A historical law that is "distinctly similar" to § 922(g)(1) would thus be one that denied felons' access to firearms.

In short, such laws did not exist until the 20th century.

1. <u>Felon disarmament is a 20th century development</u>.

Section 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007, a history professor at the University of Hartford undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Professor Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id*. at 142. A professor at the University of California-Davis School of Law concurs with Professor Churchill,

---

[3] The government cannot defend § 922(g)(1) through "analogical reasoning" and the "relevantly similar" test, which are reserved for statutes aimed at "unprecedented" problems that would have been "unimaginable" at the founding. *Bruen*, 142 S. Ct. at 2132. After all, the potential danger posed by felons' access to possess firearms would hardly have been foreign to the Founders.

noting that "state laws prohibiting felons from possessing firearms or denying firearms license to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009). It appears that no state passed a felon-disarmament law until 1923. *Id*.; *see also* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar); Mark Frassetto, *Firearms and Weapons Legislation up to the Early 20th Century* (January 15, 2013), available at SSRN: https://ssrn.com/abstract=2200991 or http://dx.doi.org/10.2139/ssrn.2200991 (cataloguing laws restricting possession of guns by "felons, foreigners and others deemed dangerous," from 1607-1791, and cataloguing that only five colonies/states had any such laws, none of which concerned felons, and almost all of which were based on racial categories that would

today be considered unconstitutionally odious); Lund, *supra* at 1357 (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War.").

Federal law did not prohibit felons from possessing firearms for 195 years after the Second Amendment was ratified. The journey to that end-point, and what is now § 922(g)(1), began with the Federal Firearms Act of 1938 (FFA). In relevant part, the FFA prohibited "any person who has been convicted of a crime of violence"[4] from shipping or transporting any firearm or ammunition in interstate or foreign commerce, or from receiving any firearm or ammunition that had been shipped or transported in interstate or foreign commerce. FFA, cg. 850, § 2(e)-(f), 52 Stat. 1250, 1251.

---

[4] Disqualifying "crime[s] of violence" were limited to "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year." FFA, ch. 850, § 1(6), 52 Stat. 1250, 1250.

In 1968, the Omnibus Crime Control and Safe Streets Act of 1968 expanded the FFA's scope by prohibiting all felons, not just those convicted of specified violent crimes, from engaging in the proscribed conduct. Pub. L. No. 90-351, § 902, 82 Stat. 197, 230-31. But it still only forbade the shipping, transport, and receipt of firearms. *See id*. The law did not prohibit possession. *See id*. Congress did not prohibit felons from possessing firearms until 1986, when it amended § 922(g)(1) in the Firearm Owners' Protection Act, Pub. L. No. 99-308, § 102(6)(D), 100 Stat. 449, 452 (1986).

In sum, there was no historical tradition circa 1791 of gun regulations "distinctly similar" to § 922(g)(1). The "Founders themselves could have adopted" felon-disarmament laws to address the "perceived societal problem" posed by felons' access to guns. *Bruen*, 142 S. Ct. at 2131. But they did not. Such laws were not passed until the 20th century, and for Mr. Butts' false statement offense, it was the late 20th Century. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Id*. at 2137. Because § 922(g)(1) does not reflect a robust historical tradition of distinctly similar regulations, it is unconstitutional.

The Court in *Bruen* said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since evidence of

40

that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154 n. 28. Regulations in our lifetime cannot establish a historical tradition unless they "confirm[]" earlier practice. *Id*. at 2137.

    2.    <u>Founding era laws did not disarm felons.</u>

        A.    <u>State constitutional conventions</u>

As just explained, the government cannot put forward actual historical regulations justifying disarmament in this case. That should end the analysis. But in addition to enacted regulations, the government frequently cites a series of unenacted convention-ratification proposals. *E.g.*, *United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023). When the states' constitutional conventions debated ratification, several suggested that the new Constitution guarantee the right to bear arms. J.Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 265-66 (2020); 1 Jonathan Elliott, *The Debates in the Several State Conventions of the Federal Constitution* 328, 335 (2d ed. 1836). Three such proposals included an arguable limitation on that right.

First, New Hampshire's convention proposed that citizens not be disarmed "unless such as are or have been in actual rebellion." 1 Elliot, *supra*, at 326. Second, Samuel Adams argued at the Massachusetts convention that "the people of the United States, who are peaceable citizens," should not be disarmed. 2 Bernard

Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971). Finally, a minority of Pennsylvania delegates – all Antifederalists who opposed ratification[5] – suggested that persons should not be disarmed "unless for crimes committed, or real danger of public injury from individuals." Schwartz, *supra*, at 662, 665.

Any comparison to these laws is a nonstarter, because a mere proposal is not a "regulation" under *Bruen*, which repeatedly emphasized the historical tradition must be a regulation. 142 S. Ct. at 2126 ("historical tradition of firearm regulation"); *id*. at 2130 (same); *id*. at 2131-32 ("capable tradition of regulation"); *id*. at 2135 ("historical tradition of firearm regulation."). The proposals "cannot counter the Second Amendment's text, or serve as an analogue . . . because, inter alia, they were not enacted." *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023) (cert granted by *United States v. Rahimi*, — S.Ct. —, 2023 WL 4278450 (June 30, 2023)). But in any case, the proposals do not support indiscriminately disarming all felons. *See, e.g.*, *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting); *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (Sykes, J., dissenting); Marshall, *supra*, at 713; Greenlee, *supra*, at 267; Larson, *supra*, at 1375.

---

[5] As *Heller* noted, it is "highly problematic" to assume that the "best or most representative reading of" the Second Amendment "would conform to the understanding and concerns of the Antifederalists." 554 U.S. at 590, n.12.

42

For starters, "only New Hampshire's proposal . . . even carried a majority of its convention." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). And that proposal would affirmatively *preclude* the government from disarming citizens for any reason other than actual rebellion. *Id*. at 454.

Furthermore, none of the proposals made it into the final text. As *Heller* warns, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." 554 U.S. at 590. *Heller* specifically admonished that "the drafting history of the Second Amendment – the various proposals in the state conventions and the debates in Congress" – is a "dubious" source for Second Amendment interpretation. *Id*. at 603. That's because the Second Amendment was "widely understood to codify a pre-existing right, rather than to fashion a new one." *Id*. If these proposals really codified previous practice, the government should be able to point to founding-era laws imposing similar firearms restrictions – evidence that exists when it comes to other rights, like voting. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (identifying 10 early-19th-century state constitutions that excluded certain convicted persons from the franchise). Yet, before the district court, the government did not provide any such evidence.

There is another issue with relying on these proposals: They differ significantly from one another and from other proposals. The conventions in Rhode

Island, New York, and Virginia proposed an unqualified "right to keep and bear arms[.]" 1 Elliott, *supra*, at 328, 335; Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 134 (1986). Thus, while three proto-Second Amendment proposals expressly limited who had the right to bear arms, three did not. Nor did the four state constitutions – including those of Pennsylvania and Massachusetts – that adopted a parallel right to arms before the Second Amendment. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006). Relying on this drafting history suggests that "different people of the founding period had vastly different conceptions of the right to keep and bear arms. That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties." *Heller*, 554 U.S. at 604–05.

### B.      Loyalists, slaves, Indians and Catholics.

As noted, three proposals from Constitution ratifying conventions addressed who may be barred from possessing arms. Only New Hampshire's was approved by a majority. It provided, "Congress shall never disarm any Citizen, unless such as are or have been in actual Rebellion." 28 *Documentary History of the Ratification of the Constitution* 378 (John Kaminski et al. eds., 2017).  "During the course of the American Revolution, over one hundred different Loyalist regiments, battalions,

independent companies or troops were formed to fight alongside the British Army against their rebellious countrymen." *A History of the King's American Regiment, Part 1*, The On-Line Institute For Advanced Loyalist Studies, available at http://www.royalprovincial.com/military/rhist/kar/kar1hist.htm.

The government has relied on a Revolution-era law disarming such Loyalists who would not swear loyalty to state or federal governments. *Jackson*, 69 F.4th at 503. Such laws would be unconstitutional today, and it's not clear that Loyalists were among "the people" whom the Second Amendment protects. *Range*, 69 F.4th at 105; *Rahimi*, 61 F.4th at 457. And regulations limited to times of "turmoil" and "rebellion" shed little light on the Second Amendment. *Bruen*, 142 S.Ct. at 2139. Moreover, individuals disarmed by loyalty statutes could regain their rights by swearing loyalty oaths, Churchill, *supra*, at 157, an option unavailable to Mr. Butts.

The government has also "argued that 'legislatures used status-based restrictions' to disarm certain groups", including slaves, Indians and Catholics. *Range*, 69 F.4th at 104-05. None of these groups reflect the Second Amendment's scope, because none had the right to bear arms. "Neither the Indian nor the slave was a citizen, therefore neither was entitled to the rights of English subjects" or post-independence, the rights of American citizens. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 141 (1994). As for Catholics,

45

"the operative rights-protecting document was the English Bill of Rights". *Harrison*, 2023 WL 1771128, at *23. Crucially, the English right "was initially limited – it was restricted to Protestants". *Bruen*, 142 S.Ct. at 2142. *See also* Stephen Halbrook, *The Founders' Second Amendment* at252 (2008) (James Madison observed England limited "arms to protest[an]ts).

These groups were excluded from the American and English rights to bear arms – "i.e., written out of 'the people' altogether." *Rahimi*, 61 F.4th at 457. "Laws applying to a group that was not protected by the right to armed self-defense cannot provide any insight into that right's scope." *Harrison*, 2023 WL 1771128, at *23.

While these now-unconstitutional laws are undoubtedly part of our history, historically, felon status alone was not a cause for disarmament. "[A]t no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a *police power* to restrict the ownership of guns *by members of the body politic*." Churchill, supra, at 142 (italics added). This "suggest[s] . . . that the colonial and early national legislators did not see the regulation of gun ownership *of citizens* as a legitimate exercise of police power." *Id*. at 155 (italics added).

**F.** **Founding-era militia statutes confirm that felons enjoyed the right to keep and bear arms.**

That the historical record reveals no statutes "distinctly similar" to § 922(g)(1) is dispositive under *Bruen*. But to the extent the Court needs additional evidence of § 922(g)(1)'s unconstitutionality, it can be found in colonial and early-Republic militia statutes.

*Heller* concluded "the Second Amendment's prefatory clause" – i.e., "A well regulated Militia, being necessary to the security of a free State" – "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. Given this "stated purpose, logic demands that if an individual was (or is) a member of the 'militia,' the Second Amendment's protections extend at least to those who constitute the militia." *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 750 (N.D. Tex. Aug. 25, 2022). "That is, although the Second Amendment is not limited to only those in the militia, it must protect at least the pool of individuals from whom the militia would be drawn." *Id.* As of 1791, that pool included felons.

*Heller* defined the militia as "all males physically capable of acting in concert for the common defense," 554 U.S. at 595, and statutory law from the founding era demonstrates that "all males" encompassed felons. In the first Militia Act, enacted one year after the Second Amendment's ratification, Congress provided that "each

47

and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of fortyfive years . . . shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271. The Act further stipulated that "every citizen so enrolled . . . shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and various other firearm accoutrements, including ammunition. *Id*. Although the Act "exempted" certain classes of people from these requirements (*e.g.*, "all custom-house officers," "all ferrymen employed at any ferry on the post road"), felons were not among them. *Id*. § 2, 1 Stat. 272. At least eight state militia statutes, passed shortly before or after 1791, contained similar requirements, and similarly did not exempt felons.[6]

As these acts show, felons in the founding era not only were permitted to possess firearms, federal law required it. Given this legal obligation, holding that

---

[6] *See* Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134-36 (1797); Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808); Herty, Digest of the Laws of Maryland, "Militia,"; Commonwealth of Massachusetts, 1780-1805, ch. 14, at 381-82, 389-90 (1898); Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251-52, 256 (1805); Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227-28, 232-33 (1792); Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700-1809); Marbury, Digest of the Laws of the State of Georgia, Act of December 24, 1792, §§ 9-10, at 350 (1802).

felons lack Second Amendment rights would be textually and historically untenable. *See McCraw*, 623 F. Supp. 3d at 750 ("It would be illogical to enumerate a constitutional right to keep and bear arms to maintain an armed militia if that right did not protect those individuals from whom a militia would be drawn.").

## G. The district court erroneously considered itself bound by *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010).

"[W]here intervening Supreme Court authority is clearly irreconcilable" with prior Ninth Circuit authority, "district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). To determine whether a prior opinion was overruled, courts look not only to "'the holdings of higher courts' decisions'" but also their "'mode of analysis.'" *Id*. (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)). Such holdings "need not be identical in order to be controlling" so long as they "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id*. Thus, to the extent *Bruen* employs a different "mode of analysis" than this Court's prior Second Amendment cases, this Court is "bound by" *Bruen*, rather than decisions that are "clearly irreconcilable" with its reasoning. *Id*.

49

*Bruen* is clearly irreconcilable with prior Ninth Circuit precedent that applied a "means-end scrutiny." *See United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013). But *Bruen* is also clearly irreconcilable with prior Circuit precedent that, like *Vongxay*, held that *Heller*'s list of "presumptively lawful" firearms restrictions automatically controls, without conducting a full – or any – historical analysis in support of that conclusion. *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (relying on *Heller*'s "presumptively lawful" language to deny a Second Amendment challenge to § 922(g)(1)).

In *Heller*, the Supreme Court confirmed an individual's right to keep and bear arms but cautioned that this right is "not unlimited." 554 U.S. at 626. To illustrate, the Court provided a non-exhaustive list of "presumptively lawful regulatory measures" – i.e., ones that had not yet undergone a full historical analysis. *Id*. at 627 n.26. This list included laws restricting possession by felons and the mentally ill and the carrying of firearms in "sensitive places." *Id*. at 626. But it also included "prohibitions on carrying concealed weapons," which "the majority of the 19th-century courts" had held were "lawful under the Second Amendment or state analogues." *Id*. Elsewhere, *Heller* confirmed this historical regulation of concealed-carry laws, pointing to multiple state Supreme Court decisions holding that the

"constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Id*. at 613, 629.

But *Heller* emphasized that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id*. And since it was the Court's "first in-depth examination of the Second Amendment," *Heller* explained that it could not "clarify the entire field." *Id*. at 635. But *Heller* promised that there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id*. *See also Skoien*, 614 F.3d at 638 ("Instead of resolving questions such as the one we must confront, the Justices have told us that the matters have been left open.").

Fourteen years later, *Bruen* undertook an "exhaustive historical analysis" of New York's state licensing regime regulating both open and concealed carrying of firearms. Specifically, New York outlawed open carry and required a showing of "proper cause" before a person could receive a license to "'have and carry concealed' a pistol or revolver." *Bruen*, 142 S. Ct. at 2123 (quoting N.Y. Penal Law § 400.00(2)(f)). While acknowledging *Heller*'s perfunctory analysis of concealed-carry laws, *Bruen* then conducted a full historical review and reached a more penetrating understanding of the history surrounding such laws. *See id*. at 2146–47. With this new understanding, it held that New York could not, in fact, issue a blanket

51

prohibition on concealed carry or even limit it to those with special self-defense needs. *Id.* at 2156.

Importantly, *Bruen* did not "overrule" *Heller*'s "holding" that concealed-carry laws were presumptively lawful. It merely did what *Heller* promised: conducted an "exhaustive historical analysis" on one of the "exceptions" that had now "come before it." *Heller*, 554 U.S. at 635. *Bruen*'s mode of analysis thus shows that Heller's preliminary list of Second Amendment exceptions was not a "holding" and does not bind future courts or prevent them from conducting a full historical review that may result in a different conclusion. So as with the New York statute, the application of *Bruen*'s revamped test – rather than *Heller*'s preliminary jurisprudence – controls.

This mode of analysis abrogates this Court's prior case law finding felon-in-possession laws constitutional. In *Vongxay*, the Court rejected a Second Amendment challenge to § 922(g)(1) by relying on *Heller*'s "presumptively lawful" language. 594 F.3d at 1115; *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016) (*Vongxay* ruled "[b]ased on this language" from *Heller*).

*Vongxay* rejected the defendant's claim that Heller's dicta about "presumptively lawful" regulations was "not binding" and instead deferred to pre-*Heller* precedent upholding, with only "minimal analysis", "the very type of gun possession restriction that the Supreme Court deemed 'presumptively lawful'" in

*Heller*. *Id*. at 1115, 1116 (discussing *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005)). But that pre-*Heller* precedent rested on an outdated legal framework that even *Vongxay* acknowledged had been "invalidated by *Heller*": the notion that the Second Amendment provides no individually-focused right to bear arms at all. *Vongxay*, 594 F.3d at 1116 (discussing *Younger*). *Vongxay* then relied on a line of cases that had upheld felon-in-possession laws under the means-end scrutiny of the second step. *Id*. at 1116–18. Because *Bruen* abolished this second step and showed that *Heller*'s list of "presumptively lawful" exceptions are not binding, *Vongxay* is no longer good law. *See Miller*, 335 F.3d at 900.

Even before *Bruen*, judges of this Court had identified "good reasons to be skeptical" that any "longstanding prohibition" prevented felons from having guns. *Phillips*, 827 F.3d at 1174; *see also id*. at n.2 (discussing sources that found "little to no historical justification for the practice"). Some judges had also doubted *Vongxay*'s holding that *Heller*'s language "categorically barred" challenges to felon-in-possession laws. *United States v. Torres*, 789 Fed. Appx. 655, 657 (9th Cir. 2020) (Lee, J., concurring). *See also Pena v. Lindley*, 898 F.3d 969, 1006 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part); *Teixeira v. County of Alameda*, 873 F.3d 670, 692 (9th Cir. 2017) (en banc) (Tallman, J., concurring in part and dissenting in part).

*Bruen* now confirms what these judges considered: as with the concealed-carry laws that *Bruen* later held unconstitutional, a full historical analysis reveals § 922(g)(1) violates the Second Amendment. Thus, for instance, a Fifth Circuit panel disregarded a prior panel's pre-*Bruen* Second Amendment holding because *Bruen*'s test "fundamentally change[d] our analysis of laws that implicate the Second Amendment rendering our prior precedent obsolete." *Rahimi*, 61 F.4th at 450-451.

Without the benefit of *Bruen*'s explication of the text and history analysis, this Court considered *Heller* to deny felons any Second Amendment rights.

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, *nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Vongxay*, 594 F.3d at 1115 (quoting *Heller*, 128 S.Ct. at 2816-2817) (italics added). The Court, thus, concluded "*Heller* does not render § 922(g)(1) unconstitutional." *Id*.

*Bruen*, however, rejects *Vongxay*'s elevation of *Heller*'s "presumptively lawful" language to controlling precedent. Neither *Heller* nor this Court has ever engaged in the text and history analysis *Bruen* demands – let alone as applied to the regulations listed in *Heller*'s perfunctory "presumptively awful" list. *Vongxay*

54

makes no mention of text or history, when the Second Amendment's text and history are the twin pillars on which *Bruen* rests. Indeed, the *Heller* dicta on which *Vongxay* relied is absent from *Bruen*. Because it did not subject felon disarmament to its text and history framework, nowhere does *Bruen* state that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *See United States v. Bullock*, — F.Supp.3d —, 2023 WL 4232309 at *1 (7th Cir. 2023) (S.D. Miss. 2023) ("*Heller*'s assurances about [the constitutionality of] felon-in-possession laws are not controlling" because *Heller* did not subject such a law to *Bruen*'s "new standard" of historical analysis).

"[W]hen deciding whether an intervening higher authority is clearly irreconcilable with our precedent, [the Court] look[s] to the '*reasoning* and *analysis*' in support of a holding, rather than the holding alone.'" *United States v. Wells*, 29 F.4th 580, 586 (9th Cir. 2022) (quoting *United States v. Lindsay*, 634 F.3d 541, 550 (9th Cir. 2011) (italics in *Lindsay*)).

As the Seventh Circuit just observed, "*Bruen* announced a new framework for analyzing restrictions on the possession of firearms." *Atkinson v. Garland*, 70 F.4th 1018, 1019 (7th Cir. 2023). This new framework is characterized as a text and history analysis. *Id*. ("The new approach anchors itself exclusively in the Second Amendment's text and the pertinent history"); *see also Alaniz*, 69 F.4th at 1127

("*Heller* analyzed the Amendment's text and history"); *Rahimi*, 61 F.4th at 450 ("*Bruen* clearly fundamentally changed our analysis of laws that implicate the Second Amendment") (quotations and citation omitted).

Nowhere does *Bruen* instruct that certain American are categorically precluded from consideration under the text and history analysis. Nowhere does the *Bruen* opinion repeat the *Heller* language on which the district court relied to refuse even considering that the text applied to Mr. Butts.

*Vongxay* did not engage in the textual and history analysis *Bruen* demands. Because *Bruen* "upended the constitutional framework for reviewing . . . firearm regulations," courts can no longer rely on the opinions that did not apply the new, controlling framework. *United States v. Alaniz*, 2022 WL 4585896, *3 (D. Idaho 2022) (affirmed 69 F.4th at 1124). *Bruen* invalidates the "presumptively lawful" analysis, and its conclusory methodology, which completely avoids *Bruen*'s text and history framework.

Lest there be any doubt, the Seventh Circuit confirmed that *Vongxay* "avoid[s] a *Bruen* analysis altogether." *Atkinson*, 70 F.4th at 1022.

> Nothing allows us to sidestep *Bruen* in the way the government invites. Yes, the Court seemed to find no constitutional fault with a state requiring a criminal background check before issuing a public carry permit. But in no way did the Court suggest that its observation resolved cases like the one Atkinson brought challenging § 922(g)(1). We must

56

undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length.

*Id*.

## H.    The Second Amendment guarantees the right to possess guns for hunting.

Application of § 922(g)(1) is particularly unwarranted in this case given Mr. Butts' benign and historically-supported purpose for possessing firearms. It is undisputed that Mr. Butts constructively possessed hunting and self-defense firearms only. While post-*Heller* caselaw focuses on self-defense, *Heller* also recognized hunting was central to the Second Amendment.

The Court explained that the Amendment's text did not suggest that right to keep and bear arms solely was meant to further the militia: "[M]ost undoubtedly thought it even more important for self-defense *and hunting*." 554 U.S. at 599 (italics added); *see also* Transcript of Oral Argument at 36–37, 54, *Heller*, 127 S. Ct. 469 (No. 07-290) (suggesting that "to keep and bear Arms" applies to guns kept for hunting).

Pennsylvania recognized the right to hunt in its Constitution.

Sect. 43. The inhabitants of this state shall have liberty to fowl and hunt in seasonable times on the lands they hold, and on all other lands therein not inclosed; and in like manner to fish in all boatable waters, and others not private property.

Pa. Const. § 43 (1776).

57

And following the Civil War, the necessity of hunting for formerly enslaved people was seen as a key reason for the right to keep and bear arms. "The freedmen of South Carolina have shown by their peaceful and orderly conduct that they can safely be trusted with fire-arms, and they need them to kill game for subsistence, and to protect their crops from destruction by birds and animals." *Heller*, 554 U.S. at 615 (2008) (quoting Joint Comm. on Reconstruction, H.R.Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 229 (1866) (Proposed Circular of Brigadier General R. Saxton)).

*Heller*'s recognition of this fundamental right reflects America's revolt against English game laws.  For example, the English threatened to seize the weapons of those who impermissibly hunted game (that is, those who were not rich landowners). Marshall, *supra* at 719; *Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126, 167 (2004) ("O.L.C. Mem.") (discussing the Game Act of 1671). But the "game laws" only targeted the weapons used in illegal hunting – they did not prevent the hunters from buying new firearms or keeping guns for self-defense. Marshall, *supra*, at 719. Prosecutions were rare. Malcolm, *supra*, at 86–89. And by the early eighteenth century, "Parliament deleted guns from the list of implements that those not qualified to hunt game were prohibited from owning." O.L.C. Mem., *supra*, at 170.

58

The Founders and their contemporaries saw game laws as antithetical to the Second Amendment and a free society. In admiring the expansive right preserved by the Second Amendment, one prominent commentator, cited in *Heller*, wrote that the England's "arbitrary" game laws "disgraced" America's former overseer. William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). That animus partly stemmed from the perception that they were designed to keep members of lower social classes subservient and dependent on more powerful social classes for subsistence. 2 William Blackstone, Commentaries on the Laws of England *412 (noting that game laws "owe their immediate origin[] to [s]lavery"). That disdain of game laws also comports with what members of this Court previously noted: "The historical context of the Second Amendment is a long struggle by the English citizenry to enable common people to possess firearms." *Silveira v. Lockyer*, 328 F.3d 567, 582 (9th Cir. 2003) (Kleinfeld, J., dissenting from denial of rehearing en banc).

> The Second Amendment protects gun possession for hunting.
>
> Moreover, in early America, free of England's feudal heritage, such game laws were unknown and denounced, including by the early constitutional commentators (such as Rawle), who praised the Second Amendment for not allowing such things.

Marshall*, supra*, at 720.

## I.      As-applied, § 922(g)(1) violates Mr. Butts' Second Amendment rights.

"When the Second Amendment was ratified, times were different.  Firearms were ubiquitous and their regulation was sparse." *Mai v. United States*, 974 F.3d 1082, 1084 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc).  Firearms remain ubiquitous in Montana for hunting, including side-arms for self-defense against predators.

The Court must consider whether § 922(g)(1), while perhaps permissible in other situations, "is nonetheless unconstitutional as applied to [Mr. Butts'] activity". *Spence v. Washington*, 418 U.S. 405, 414 (1974) (reversing conviction).  The Court must adjudicate that constitutionality first: "for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first." *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 485 (1989).  In that regard, "[a]s-applied challenges are the basic building blocks of constitutional adjudication". *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007).

The facts here are undisputed.  The guns did not belong to Mr. Butts.  He constructively possessed them, after the lawful owners left them in his camper and house. The gun owners attested to their purpose – hunting and self-defense.  The President of the Montana Outfitters Association corroborated that use.    Mr. Butts'

60

predicate felony dates to 2006. Like Mr. Range, albeit in a different context, it was for making a false statement in an application. *See Range*, 69 F.4th at 98.

The district court found that Mr. Butts "successfully participat[ed] in supervised release" for that 17-year old conviction. ER-34. It found he "has dealt with his anger management issue". *Id*. It found "he has abided completely, in every respect , by the [pretrial release] conditions that were set by the Court, including the payment of contribution toward his attorney's fees." ER-35.

It ruled the guns were for sport and their use was not "a significant serious offense", ER-36: "[T]here's no indication that the firearms that Mr. Butts had in his possession or was using were anything other than for sporting purposes. . . . I would not categorize Mr. Butts using a .22 rifle to shoot gophers or target shoot on his own property would be a significant serious offense." ER-35–36.

It found "Mr. Butts has a respect for the law." ER-36. It found that the facts in the PSR "reflect somebody who is likely a good citizen." *Id*.

It concluded that the "need to protect the public from further crimes by Mr. Butts[,] I don't think that's an issue." *Id*.

The government did not object to any of these facts and conclusions.

Mr. Butts has paid his fine and is successfully serving probation.

As reviewed above, the government cannot establish a long-standing, founding era tradition of dispossessing felons of firearms, especially one like Mr. Butts. "Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like [Mr. Butts] of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Range*, 69 F.4th at 106. *See also Bullock*, 2023 WL 4232309 at *28-31 (granting as-applied Second Amendment challenge to felon-in-possession prosecution, where defendant spent 15-16 years in prison for aggravated assault and manslaughter following a deadly bar fight).

## VII. CONCLUSION

The Court should reverse the district court's order denying Mr. Butts' motion to dismiss and remand to the district court for further proceedings.

RESPECTFULLY SUBMITTED this 27th day of July, 2023.

SHAWN LEE BUTTS

By:   */s/John Rhodes*
       JOHN RHODES
       Assistant Federal Defender
       Federal Defenders of Montana
         Counsel for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this Opening Brief of Defendant-Appellant is in compliance with Ninth Circuit Rule 32(a). The Brief's line spacing is double spaced. The brief is proportionately spaced, the body of the argument has a Times New Roman typeface, 14 point size and contains less than 14,000 words, including footnotes and quotations. (Total number of words: 13,596, excluding tables and certificates).

DATED this 27th day of July, 2023.

SHAWN LEE BUTTS

By: */s/John Rhodes*
JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
Counsel for Defendant

63

## <u>STATEMENT OF RELATED CASES</u>

Undersigned counsel is aware that the defendants in the following pending cases have also challenged 18 U.S.C. § 922(g)(1) under the Second Amendment: *United States v. Rojo*, No. 23-598, *United States v. Howard*, No. 22-10211, *United States v. Registe*, No. 20-30042, and *United States v. Duarte*, No. 22-50048. But the legal issues in those cases may differ from the issue raised here depending on whether this Court applies plain error review. *United States v. Registe*, No. 20-30042, Doc. 45, at 15 (government arguing that plain error review should apply); *United States v. Duarte*, No. 22-50048, Doc. 33, at 26 (same).

DATED this 27th day of July, 2023.

SHAWN LEE BUTTS

By:     */s/John Rhodes*
        JOHN RHODES
        Assistant Federal Defender
        Federal Defenders of Montana
                Counsel for Defendant

## <u>CERTIFICATE OF SERVICE</u>
### Fed.R.App.P.25

I hereby certify that on July 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

SHAWN LEE BUTTS
276 Beaver Lake Road
Whitefish, MT 59937

Defendant-Appellant

*/s/John Rhodes*
JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
Counsel for Defendant