No. 23-313

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

**UNITED STATES OF AMERICA**,
PLAINTIFF-APPELLEE,

V.

**SHAWN LEE BUTTS**
DEFENDANT-APPELLANT.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
D.C. NO. CR-22-33-M-DWM

———————————

**ANSWERING BRIEF OF THE UNITED STATES**

———————————

JESSE A. LASLOVICH
United States Attorney

TIMOTHY A. TATARKA
Assistant U.S. Attorney
District of Montana
2601 2nd Avenue North
Suite 3200
Billings, MT 59101
Telephone: (406) 657-6101

Attorneys for Appellee

# TABLE OF CONTENTS

Table of Contents ................................................................i

Table of Authorities ........................................................ iii

Introduction ..................................................................... 1

Statement of Jurisdiction ................................................ 3

Statement of the Issue .................................................... 3

Statement of the Case .................................................... 3

Statement Regarding Oral Argument ............................... 3

Statement of Facts ........................................................... 4

    I.  Shawn Butts is convicted of felony criminal endangerment, felony criminal mischief, and resisting arrest for shooting a firearm at a local residence ................................................................... 4

    II. Butts is Convicted of a Federal Offense for False Statement on a Firearms Transaction. ................... 6

    III.Butts is Found in Possession of a Firearm in Violation of 18 U.S.C. § 922(g)(1). ........................... 6

Summary of Argument .................................................... 7

Argument ....................................................................... 8

    I.  Butts Cannot Show the United States' Prohibition on Possession of a Firearm by a Felon is Unconstitutional. ....................................................... 8

       A. Section 922(g)(1) is Constitutional Under the Precedents of Both the Supreme Court and this Court.. ................................................................. 9

i

B. Even if *Bruen* Had Abrogated this Court's Precedent, Butts cannot Show that 18 U.S.C. § 922(g)(1) Is Facially Unconstitutional. ...........................23

C. Because his convictions include offenses showing of the potential to misuse firearms, Butts cannot show 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him. ...................................65

Conclusion...........................................................................71

Statement of Related Cases..............................................71

Certificate of Compliance ................................................72

Certificate of Service.........................................................73

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Baze v. Rees,*
   553 U.S. 35 (2008) ............................................................... 51, 54, 60

*Dickerson v. New Banner Institute, Inc.,*
   460 U.S. 103 (1983) ........................................................ 46

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ............................................... passim

*Folajtar v. Attorney General,*
   980 F.3d 897 (3d Cir. 2020) ...................................... passim

*Hamilton v. Pallozzi,*
   848 F.3d 614 (4th Cir. 2017) .................................... 61

*Kanter v. Barr,*
   919 F.3d 437 (7th Cir. 2019) ................................... 47, 59

*Mai v. United States,*
   974 F.3d 1082 ................................................... 50

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ............................................. 11, 24

*Medina v. Whitaker,*
   913 F.3d 152 (D.C. Cir. 2019) .............................. passim

*Miller v. Gammie,*
   335 F.3d 889 (9th Cir. 2003) *Patterson v. Winn* ..................... 22, 23

*New York State Rifle & Pistol Ass'n v. City of New York,*
   140 S. Ct. 1525 (2020) ........................................ 17

*New York State Rifle & Pistol Assoc., Inc. v. Bruen,*
   142 S. Ct. 2111 (2022) ........................................ passim

*Patterson v. Winn,*
   5 Pet. 233 (1831) ............................................. 40

*Range v. Attorney General,*
69 F.4th 96 (3d Cir. 2023) .............................................................. 69

*Silveira v. Lockyer,*
312 F.3d 1052 (9th Cir. 2002) .................................................. 21, 36

*State v. Hogan,*
58 N.E. 572 (Ohio 1900) .......................................................... 45, 68

*State v. Shelby,*
2 S.W. Mo. 468 (1886) .................................................................. 45

*Trigueros v. Adams,*
658 F.3d 983 (9th Cir. 2011) ........................................................... 5

*United States v. Alaniz,*
69 F.4th 1124 (9th Cir. 2023).................................................. passim

*United States v. Chovan,*
735 F.3d 1127 (9th Cir. 2013) ....................................................... 13

*United States v. Everist,*
368 F.3d 517 (5th Cir. 2004) ......................................................... 22

*United States v. Holden,*
70 F.4th 1015 (7th Cir. 2023).................................................... 2, 69

*United States v. Jackson,*
69 F.4th 495 (8th Cir. 2023)..................................................... passim

*United States v. Jimenez-Shilon,*
34 F.4th 1042 (11th Cir. 2022)....................................................... 54

*United States v. Kelly,*
2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022)............................. 63

*United States v. Kurt,*
988 F.2d 73 (9th Cir. 1993) ..................................................... passim

*United States v. McCane,*
573 F.3d 1037 (10th Cir. 2009) ................................................. 23, 48

*United States v. Phillips,*
   827 F.3d 1171 (9th Cir. 2016) ................................................... 13, 21

*United States v. Ramos,*
   2022 WL 17491967 (C.D. Cal. Aug. 5, 2022) ................................ 16

*United States v. Salerno,*
   481 U.S. 739 (1987) ................................................................. 9, 23

*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) ................................................ 58, 59

*United States v. Torres,*
   911 F.3d 1253 (9th Cir. 2019) ....................................................... 49

*United States v. Vongxay,*
   594 F.3d 1111 (9th Cir. 2010) ............................................... passim

*United States v. Younger,*
   398 F.3d 1179 (9th Cir. 2005) ....................................................... 21

*Van Der Hule v. Holder,*
   759 F.3d 1043 (9th Cir. 2014) ....................................................... 13

*Vincent v. Garland,*
   80 F.4th 1197 (10th Cir. 2023) ...................................................... 23

## Statutes

18 U.S.C. § 922(g)(1) .................................................................. passim

18 U.S.C. § 3231 ................................................................................. 3

28 U.S.C. § 1291 ................................................................................. 3

Mont. Code Ann. § 45-5-207 ....................................................... 4, 67

Mont. Code Ann. § 46-18-810(2) ...................................................... 67

Firearms Owners' Protection Act, Pub. L. No. 99-308 ...................... 45

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No.
   103-322 ...................................................................................... 46

U.S. Const. Art. I ................................................................................50

**Rules**

Fed. R. App. P. 34(a) ...........................................................................3

**Other Authorities**

1 Mo. Rev. Stat. ch. 24, Art.II, § 1274 (1879) ...............................43, 44

1 Richard Burn, The Justice of the Peace, and Parish Officer 13-14
(2d ed. 1756) .......................................................................................30

1 *The Remembrancer; or Impartial Repository of Public Events, for
the Year 1781*, (1780).....................................................................31, 32

1 W. & M., Sess. 1, ch. 15, 6 Statutes of the Realm 71......................54

1 William Hawkins, A Treatise of the Pleas of the Crown
(1716)....................................................................................................30

2 Joseph Shaw, The Practical Justice of Peace, and Parish and Ward-
Officer (6th ed. 1756)...........................................................................30

2 *The Documentary History of the Ratification of the Constitution
(Documentary History)* (Merrill Jensen ed., 1976)............................33

2 *The Remembrancer; or, Impartial Repository of Public Events, for
the Year 1780,* (1780) ..........................................................................31

4 *Journals of the Continental Congress 1774-1789*, (Worthington
Chauncey Ford ed., 1906) …………….....................................…40

4 *Journals of the Continental Congress 1774-1789*, (1906) (resolution
of March 14, 1776)................................................................................56

4 William Blackstone, Commentaries on the Laws of England (10th
ed. 1787)...............................................................................................30

4 William Blackstone, *Commentaries on the Laws of England* (1st ed. 1769)..................................................................................51

5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* (1886) (1776 Mass. law).....................................56

7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* (1820) (1756 Va. law)............................................................54

9 *The Statutes at Large of Pennsylvania from 1652-1801* § 3 (William Stanley Ray ed., 1903).................................................................57

21 The Parliamentary History of England, from The Earliest Period to the Year 1803, (T.C. Hansard 1814)................................................31

42 The Scots Magazine 419 (Aug. 1780)............................................31

49 The London Magazine or Gentleman's Monthly Intelligencer 518 (Nov. 1780).........................................................................31

Act of 1776, 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (John Russell Bartlett ed., 1862)..40

Act of 1777, ch. 6, § 9, 24 The State Records of North Carolina 89 (Walter Clark ed., 1905)……………………………………………40

Act of Apr. 8, 1881, ch. 548,§ 1, 16 Del. Laws 716 (1881) .................43

Act of Apr. 16, 1881, §2, 1881 Ill. Laws 73……………………………43

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157......43

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290.........................................................................................43

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232....................44

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34.......................................44

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110........44

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232......................44

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170........................44

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34.......................................44

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110........44

Act of Apr. 30, 1855, §§ 1-2, in 2 The General Laws of the State of California, from 1850 to 1864, inclusive 1076-1077 (Theodore H. Hitchell ed., 1865)...................................................................................44

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170........................44

Act of Dec. 6, 1783, ch. 1059, § 1, 11 The Statutes at Large of Pennsylvania from 1682 to 1801, at 209-210 (1906)......................41

Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25................44

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112 ......................43

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 ............... 43, 44

Act of Feb. 18, 1794, §1, *The Laws of the State of New Hampshire 460* (1815)...................................................................................................41

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17.........................43

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87...........43

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59........................43

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221...............................................43

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87.............43

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.............43

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656.........................43

Act of Mar. 5, 1883, ch. 105, § 1, 1883Kan. Sess. Laws 159..............43

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del.Laws 225 (1879)...............43

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355............44

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890).............41

Act of Mar. 15, 1788, ch. 81, §1, 2 Laws of the State of New-York, 95-96 (2d ed. 1807)...........................................................................41

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159...............................43

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14.......................................43

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468....................................43

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80........................43

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140...........................................................................................43

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394.............43

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69.............................44

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297.......44

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355............44

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274..............44

ix

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 .................43

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.............44

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69...........................44

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297.......44

Act of May 1, 1776, ch. 21, § 2, 5 Acts and Resolves, Public and
Private, of the Province of Massachusetts Bay 480 (1886)..............40

Act of May 1777, ch. 3, 9 The Statutes at Large: Being a Collection of
All the Laws of Virginia, from the First Session of the Legislature, in
the Year 1619, at 282 (William Waller Hening ed., 1821)...........…40

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67;

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30..........44

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30..........44

Act of Nov. 1, 1692, ch. 18, § 6, 1 Acts and Resolves of the Province of
Massachusetts Bay 52-53 (1869)…………..…………………………41

Act of Nov. 27, 1786, ch. 21, A Collection of all such Acts of the
General Assembly of Virginia, of a Public and Permanent Nature, as
are now in Force 33 (1794)…………………………………..………….41

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83.......43

Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757     45

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39………………..…43

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.)…………………43

Act of June 12, 1879, § 2, 1879 Ohio Laws 192..................................44

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144............43

Act of June 14, 1701, ch. 7, 1 Laws of New Hampshire 679 (Albert Stillman Batchellor ed., 1904)...............................................41

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112.............................43

Act of June 12, 1879, § 2, 1879 Ohio Laws 192.................................44

Act of June 14, 1701, ch. 7, 1 Laws of New Hampshire 679 (Albert Stillman Batchellor ed., 1904)...............................................41

Act of Sept. 20, 1777, ch. 40, § 20, Acts of the General Assembly of the State of New-Jersey 90 (1777)......................................................40

A.J. Grover*, Impeachment of Franklin Pierce* (Aug. 1, 1856), in The Liberator, Aug. 22, 1856......................................................36

Akhil Reed Amar, *The Bill of Rights* 48 (1998)...................................48

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) .....................................................................52

Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.)..................*passim*

*Calendar of State Papers, Domestic Series, Charles II, 1661-1662* (Mary Anne Everett Green ed., 1861)................................................29

*Calendar of State Papers, Domestic Series*, 1670 (Mary Anne Everett Green ed., 1895)...................................................................29

*Calendar of State Papers, Domestic Series, May 1, 1684–February 5, 1685* (F.H. Blackburne Daniell & Francis Bickley eds., 1938)...........29

*Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700-8 March, 1702* (Edward Bateson ed., 1937)...........29

Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856) ..........36

Cong. Globe, 39th Cong., 1st Sess. 915 (1866) ................................. 37

Cong. Globe, 39th Cong., 1st Sess. at 908-909 ................................. 37

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1983) .................................................... 12

Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573 (2022) ......................................................................... 52

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.) ................................................................... 41

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461 (1995) .................................................... 12, 20

Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220 ... 45

H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866) .................... 38

H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866) ................. 38

Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), in *The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888) .................................................................................................. 37

*High-Handed Outrage in Kansas*, Holmes County Republican, Oct. 30, 1856 .................................................................................................. 36

James Davis, *The Office and Authority of a Justice of Peace 5* (1774) (N.C.) ................................................................................................... 40

James Parker, *Conductor Generalis* 12 (1764) (N.J.) ...................... 40

James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.) ................................................................................................... 41

James Parker, *Conductor Generalis* (Robert Campbell printing 1792) (Pa.) ..................................................................................................... 41

James Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28 (2006) ...................................................... 57

John Holmes, *The Statesman, or Principles of Legislation and Law* (1840) .................................................................................................... 35

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) ........................................................................................................... 55

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* (1773)……………………………………................................41

Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right (1994) ................................................................ 31

Ky. Gen. Stat. ch. 29, Art. 29, § 1 (Edward I. Bullock & William Johnson eds., 1873)……………………………………….................. 43

Mass. Rev. Stat. ch. 134, § 16 (1836) .................................................. 42

Miss. Rev. Code ch. 77, § 2964 (1880) ................................................ 44

New-York Daily Tribune, Oct. 2, 1856 ............................................... 36

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A,Tit. I, Sec. 101(f) [tit. VI,§ 658(b)(2)], 110 Stat. 3009-372 ................................................................................................. 46

Ordinance of Oct. 9, 1652, Laws and Ordinances of New Netherland, 1638-1674, at 138 (E.B. O'Callaghan ed., 1868)…………………..41, 66

Order of Council to Lord Lieutenants (Sept. 5, 1745), in Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* (1905)..................... 29

Privy Council to Lord Newport (Jan. 8, 1661), in *Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d ser., vol. 4, (1904) ...................................................................................... 29

xiii

Privy Council to the Earl of Carlisle (July 30, 1714), in *Historical Manuscripts Commission, Tenth Report*, Appendix, Part IV (1885)..................................................................................29

Oscar Handlin & Mary Handlin eds.,*The Popular Sources of Political Authority:Documents on the MassachusettsConstitution of 1780* (1966)..................................................................................32

Resolves of Apr. 6, 1776, 8 The Statutes at Large of Pennsylvania from 1682-1801 (1902)……………………………………....................40

*State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842 ......................................................35

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* (2008) ..........................................60

Stuart Banner, *The Death Penalty: An American History* (2002) ....51

*The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* (1890)..................................................56

*The Sale of Pistols*, New York Times, June 22, 1874 .......................38

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1st ed. 1868) ..........................................47

U.S. Const. amend. II .......................................................9

W. Nelson, The Office and Authority of a Justice of Peace (7th ed. 1721)..................................................................30

William Waller Hening, *The New Virginia Justice* (1795) (Va.)........41

xiv

## INTRODUCTION

In 2004, Shawn Butts was convicted of felony criminal endangerment and felony criminal mischief in Montana. Butts fired a weapon at a local residence and, when advised he was under arrest, kicked and fought with the arresting officers until he was sprayed with pepper spray. A year later, shortly after violating a protective order against a neighbor, Butts attempted to obtain a firearm despite being prohibited. Butts falsely affirmed he had never been convicted of a felony and was convicted of another felony for making a false statement during a firearms transaction.

In 2022, Butts was caught in possession of firearms. He was indicted and subsequently pleaded guilty to a violation of 18 U.S.C. § 922(g)(1), possession of a firearm by a felon. He reserved his right to appeal and challenges the constitutionality of the statute.

Butts's challenge is almost exclusively facial. He devotes only three pages of his sixty-two-page brief to his as-applied challenge. He makes no attempt to show that his conviction, which involved lying to obtain a firearm that he was prohibited from possessing after "knowingly engaging in conduct that creates a substantial risk of

1

death or serious bodily injury" with a firearm, renders the statute unconstitutional for other than facial invalidity. *See United States v. Holden*, 70 F.4th 1015, 1018 (7th Cir. 2023) ("[O]ne might think that the very act of lying to obtain a firearm implies a risk that the weapon will be misused.").

Regardless, Butts's challenge is foreclosed by this Court's decision in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) that felons are "categorically different from the individuals who have a fundamental right to bear arms," *id*. at 1115. The Supreme Court's holding that a state cannot "prevent[] *law-abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms" in public, *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022) (emphasis added), is not clearly irreconcilable with that binding precedent.

Moreover, even setting aside circuit precedent, the historical understanding of the right to bear arms and the historical tradition of firearms regulation make clear that 18 U.S.C. § 922(g)(1) is consistent with Congress's authority to disarm those who are not law-abiding, responsible citizens.

2

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291.  Final judgment was entered on March 2, 2023.  ER-15.  The defendant timely filed a notice of appeal on March 6, 2023.  ER-176.

## STATEMENT OF THE ISSUE

Whether 18 U.S.C. § 922(g)(1) is unconstitutional on its face or as applied to Butts, who has a previous felony conviction for making a false statement in a firearms transaction for failing to report his prior conviction for criminal endangerment involving a firearm?

## STATEMENT OF THE CASE

A federal grand jury indicted Butts for Prohibited Person in Possession of a Firearm.  ER-162-163.  Butts filed a motion to dismiss the indictment, which was denied.  ER-4.

Butts subsequently pled guilty, reserving his right to appeal.  ER-89-97.  The district court sentenced Butts to three years of probation.  ER-15-16.  Butts appeals.  ER-176-177.

## STATEMENT REGARDING ORAL ARGUMENT

Under Federal Rules of Appellate Procedure 34(a), the United States advises the Court of its view that oral argument is

unnecessary because the facts and legal arguments are adequately presented in the briefs and record.

## STATEMENT OF FACTS

### I. Shawn Butts is convicted of felony criminal endangerment, felony criminal mischief, and resisting arrest for shooting a firearm at a local residence.

In April of 2004, Butts was arrested following reports of shots fired at a local residence. PSR ⁋40. Butts was discovered in a field behind his residence wearing a shoulder holster containing a loaded Ruger Red Hawk .44 Magnum. *Id.* Butts was initially compliant and surrendered the weapon, but when he was advised that he was being arrested he began to struggle and kick officers. He continued to fight despite several directives to stop resisting and was eventually sprayed with pepper spray. *Id.*

Butts was convicted of felony criminal endangerment, in violation of Mont. Code Ann. § 45-5-207, which includes the element that the person "knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another." PSR

⁋40.  He was also convicted of felony criminal mischief and two counts of resisting arrest.[1]  *Id.*

Although he was initially given a deferred sentence, that sentence was revoked after Butts violated a temporary restraining order for launching rocks or dirt clods at a neighbor's house with a sling shot.  PSR ⁋40.  He was then sentenced to 10 years in Montana State Prison, with six years suspended.  *Id.*

---

[1] The Information in *State v. Butts*, BDC 2004-89, Doc. 1 (Mont. Dist. Ct. Apr. 26, 2004), to which Butts pleaded guilty, details that Butts "knowingly engaged in conduct that created a substantial risk of death or serious bodily injury by repeatedly shooting his rifle in the area of" a Helena residence.  The felony criminal mischief charge, to which Butts also pleaded guilty, details that Butts "knowingly or purposely injured, damaged, or destroyed property of another by causing damage in an amount in excess of $1,000 to a Northwest Energy power pole, by using it for a target for shooting his rifles, without consent."  While this document was not part of the record below, Butts added his as-applied challenge to the statute only after briefing on his motion was complete.  *See* ER-5 n.1, ER-182.  Accordingly, to the extent the Court entertains Butts's suggestion that he cannot constitutionally be disarmed and deems Butts's criminal history illustrating an unacceptable danger if armed to be relevant, the Court can take judicial notice of the state charges for which he was convicted.  *See Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) (holding that, even outside the district court record, this Court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." (citation omitted)).

## II.  Butts iis Convicted of a Federal Offense for False Statement on a Firearms Transaction.

In 2005, despite his felony convictions for criminal endangerment and criminal mischief being reimposed just 41 days prior and despite being advised he was prohibited, Butts attempted to purchase a firearm.  PSR ⁋⁋40-41.  He falsely affirmed that he had not been convicted of a crime punishable by more than one year imprisonment on the form required to complete the purchase.  PSR ⁋41.  He was sentenced to 30-months imprisonment.  *Id.*

## III.  Butts is Found in Possession of a Firearm in Violation of 18 U.S.C. § 922(g)(1).

In June 2022, Butts was indicted on a single count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  ER-162-163.  Following witness reports of gunfire on Butts's property, law enforcement executed a search warrant and recovered four firearms and ammunition from Butts's trailer and residence.  ER-4.

Butts moved to dismiss the indictment on the ground that 18 U.S.C. § 922(g)(1) is facially unconstitutional.  ER-116-117, 121.  After briefing was complete, Butts filed affidavits and claimed he challenged the statute as applied to his "possession of guns at his

6

residence for the purpose of hunting." ER-5. The court determined his new argument did not change the outcome. *Id.*

The court denied Butts's motion, concluding that *Bruen* did not upset the prior Supreme Court and Ninth Circuit precedent that "provide independent, legal grounds for denying Butts's motion." ER-8. The court held that "because *Bruen* does not disturb the felon dispossession component of *Heller*, it does not render § 922(g)(1) unconstitutional." ER-10. The court also held that the Ninth Circuit case on point, *Vongxay*, was not clearly irreconcilable with *Bruen* and remained binding precedent, providing additional ground to deny the motion. ER-12.

Butts entered a conditional guilty plea preserving his right to appeal. ER-89-97. He was sentenced to three years of probation. ER-15-16. This appeal follows. ER-176-177.

## SUMMARY OF ARGUMENT

Butts's conviction should be affirmed. Ninth Circuit precedent upholding § 922(g)(1) in response to facial and as-applied Second Amendment challenges remains binding and forecloses Butts's claims. Moreover, even if the Court's pre-*Bruen* case law is no longer

7

binding, § 922(g)(1) is consistent with the Nation's historical tradition of firearms regulation and is therefore constitutional under *Bruen*. Butts cannot succeed on a facial challenge because § 922(g)(1) is consistent with the Nation's historical regulation of firearm possession by those who are not law-abiding and those who pose an unacceptable risk of danger if armed. Nor can he show that the statute is unconstitutional as applied to him because he was disarmed after being convicted of using deceit to subvert a prior prohibition on firearm possession expressly for criminal endangerment with a firearm—conduct at the very center of the government's authority to disqualify individuals from the right to bear arms.

This Court should affirm.

## ARGUMENT

### I.  Butts Cannot Show the United States' Prohibition on Possession of a Firearm by a Felon is Unconstitutional.

**Standard of review:** This Court reviews the constitutionality of a statute de novo. *Vongxay*, 594 F.3d at 1114. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount

successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Meanwhile, "[a] defendant cannot claim a statute is unconstitutional in some of its reaches if the statute is constitutional as applied to him." *United States v. Kurt*, 988 F.2d 73, 78 (9th Cir. 1993). Thus, Butts bears the burden of "show[ing] that he was a member of the class arguably unconstitutionally affected by the statute." *Id.*

### A. Section 922(g)(1) is Constitutional Under the Precedents of Both the Supreme Court and this Court.

> *1. The Supreme Court held in* Heller *that the Second Amendment protects an individual right of law-abiding citizens.*

Whether considered facially or as applied, Butts's challenge to the constitutionality of 18 U.S.C. § 922(g)(1) is foreclosed by Supreme Court and Ninth Circuit precedent.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court concluded,

"on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. 570, 595 (2008).

The Court made clear, however, that "the right secured by the Second Amendment is not unlimited." *Id.* at 626; *cf. id.* at 635 (noting by way of analogy that certain types of speech, including "obscenity, libel, and disclosure of state secrets," fall outside the scope of the First Amendment's free-speech clause). With respect to the Second Amendment, the Court identified the right to keep and bear arms as belonging to "law-abiding, responsible citizens." *Id.* at 635. And, consistent with that understanding, the Court specifically stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which the Court deemed "presumptively lawful." *Id.* at 626 & n.26. Indeed, the Court held that Heller—the plaintiff in that case—would be entitled to keep a handgun in his home "assuming" that he is "not disqualified from the exercise of Second Amendment rights." *Id.* at 635; *see also id.* at 631 (interpreting "not otherwise disqualified" to mean "not a felon and is not insane").

Two years later, in *McDonald v. City of Chicago*, a plurality of the Court "repeat[ed]" the "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626).

> *2. Following* Heller*, this Court repeatedly upheld § 922(g)(1) based on the text and history of the Second Amendment.*

Following *Heller* and *McDonald*, this Court has upheld the constitutionality of § 922(g)(1) based on the Supreme Court's articulation of the scope and limits of the right to bear arms.

Most important here, this Court's decision in *Vongxay* rejected a nonviolent felon's claim that § 922(g)(1) violated his Second Amendment rights. 594 F.3d at 1118. As this Court held, felons are "categorically different from the individuals who have a fundamental right to bear arms." *Id.* at 1115. This Court determined that "[n]othing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)." *Id.* at 1114-15. In particular, the Court emphasized *Heller*'s recognition that its holding was limited to those "not disqualified from the exercise of Second Amendment

rights." *Vongxay*, 594 F.3d 1115 (quoting *Heller*, 554 U.S. at 635); *see id.* at 1116 (explaining that "limit[s] to the scope of [a court's] holdings . . . are integral to those holdings").

To confirm its conclusion, this Court also examined "cases from other circuits and [] historical gun restrictions." *Id.* at 1116-17. And while recognizing that the "historical question" had not been "definitively resolved," this Court concluded that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry],'" which excludes criminals. *Id.* at 1118 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1983), and citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)).

Critically, this Court's decision in *Vongxay* did not—even as an alternative holding—engage in an analysis involving intermediate scrutiny, strict scrutiny, or any "means-end" scrutiny balancing the costs and benefits of prohibiting felons from possessing firearms. *Cf.* 594 F.3d at 1117 (mentioning "heightened scrutiny" only to describe the Fifth Circuit's pre-*Heller* precedent). Instead, *Vongxay* based its

12

holding on *Heller*'s "analy[sis] [of] the history of the Second Amendment." 594 F.3d at 1115.

This Court has since relied on *Vongxay* to repeatedly reject Second Amendment challenges to § 922(g)(1). *See, e.g.*, *United States v. Phillips*, 827 F.3d 1171, 1173-74 (9th Cir. 2016); *Van Der Hule v. Holder*, 759 F.3d 1043, 1050-51 (9th Cir. 2014); *cf. United States v. Chovan*, 735 F.3d 1127, 1144-45 (9th Cir. 2013) (Bea, J., concurring) (observing that "*Heller* seemed to equate the status of a felon . . . with a presumptive disqualification from the Second Amendment right," because "[t]hroughout history, felons have been subject to forfeiture and disqualification").

> **3.** Vongxay *remains controlling precedent, and its history-based analysis was reaffirmed—not overruled—by* Bruen.

The Supreme Court's recent decision in *Bruen* changed none of this. *Heller* based its reasoning on the "text and history" of the Second Amendment, 554 U.S. at 595, as did *Vongxay*, 594 F.3d at 1115, 1118 (relying on the historical analysis in *Heller* and by "scholars of the Second Amendment"). And in *Bruen* the Supreme

Court reaffirmed this focus on "the Second Amendment's text, as informed by history." 142 S. Ct. at 2127

*Bruen* involved a state licensing regime that required applicants to demonstrate a "special need" to carry a handgun gun in public. *Id.* at 2122. Both the applicants and the state agreed that the Second Amendment "protect[s] the right[s]" of "ordinary, law-abiding citizens . . . to carry handguns publicly for their self-defense." *Id.* The court of appeals, however, had upheld the "special need" licensing regime on the ground that it satisfied intermediate scrutiny. *Id.* at 2125.

*Bruen* rejected such an "interest-balancing inquiry" or "means-end test" as inconsistent with *Heller.* *Id.* at 2129. Rather than apply a freestanding standard that "asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests," a court should look to "text and history" to "defin[e] the character of the right" or "the outer limits of the right," or to "assess[] the constitutionality of a particular regulation." *Id.* (quotation marks omitted). *Bruen* then undertook a lengthy historical analysis, *id.* at

14

2138-56, concluding that a state cannot "prevent[] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms" in public. *Id.* at 2156.

Nothing in *Bruen* undermined *Vongxay* or displaced *Heller*'s recognition that felons do not have a constitutional right to bear arms. To the contrary, *Bruen*'s analysis implicitly acknowledged *Heller*'s exclusion of felons from "the people" protected by the Second Amendment. *See* 142 S. Ct. at 2134 ("It is undisputed that petitioners Koch and Nash—two ordinary, *law-abiding*, adult citizens—are part of 'the people' whom the Second Amendment protects." (emphasis added, citing *Heller*, 554 U.S. at 580)). Indeed, *Bruen* repeatedly limited its definition of the scope of the right to "law-abiding" citizens, using that phrase no fewer than *14 times* throughout the opinion. *See* 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156. As discussed below, it is telling that *Bruen* expressly framed the test of whether a modern law was consistent with the Nation's historical tradition of firearms regulation by asking if it was analogous to historic regulations based on "how and why the regulations burden *a law-abiding citizen's* right

15

to armed self-defense.'" *Bruen*, 142 S. Ct. at 2132-33 (emphasis added).

"Most convincingly," as one district court in the Ninth Circuit summarized:

> *Bruen* notes that it is perfectly permissible to require that an individual be licensed before he can carry a hand gun, so long as the licensing regime avoids discretionary criteria and contains only "narrow, objective, and definite standards." A permissible scheme, according to the Court, will "often require applicants to undergo a background check . . . designed to ensure *only that those bearing arms in the jurisdiction are, in fact, law abiding and responsible citizens*."

*United States v. Ramos*, No. 2:21-cr-00395-RKG-1, 2022 WL 17491967, at *3 (C.D. Cal. Aug. 5, 2022) (quoting *Bruen*, 142 S. Ct. at 2138 n.9) (citations omitted emphasis in original).

*Bruen* additionally stressed that it was "reiterat[ing]" *Heller*'s approach, clarifying the legal standard "[i]n keeping with *Heller*," and "apply[ing]" the "test that [the Court] set forth in *Heller*." 142 S. Ct. at 2126, 2129, 2131. Indeed, three justices who joined the Court's decision underscored the limits of *Bruen* and expressly noted that felon-possession prohibitions fell within them. *See id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons"

16

are constitutional under *Heller* and *McDonald* (quotation marks

omitted)); *id.* at 2157 (Alito, J., concurring) (explaining that *Bruen*

did not "disturb[] anything that [the Court] said in *Heller* or

*McDonald* about restrictions that may be imposed on the possession

or carrying of guns" (citation omitted)).  Justice Alito made the point

clearly:  "All that we decide in this case is that the Second

Amendment protects the right of *law-abiding* people to carry a gun

outside the home for self-defense."  *Id.* at 2159 (emphasis added).[2]

---

[2] In total, eight members of the *Bruen* Court—every member but Justice Barrett—has joined an opinion expressly approving of *Heller*'s and *McDonald*'s approval of felon-dispossession statutes.  In addition to the three concurring justices noted above, the three dissenters in *Bruen* agreed with the concurrences that "the Court's opinion" should be understood as "cast[ing] no doubt on [the] aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms.  *Bruen*, 142 S. Ct. at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting).  And two years earlier, Justices Thomas and Gorsuch wrote that *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm," including laws "prohibiting possession by felons and other dangerous individuals."  *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting from denial of *certiorari*).

> *4. Defendant's arguments that Bruen overruled Vongxay are meritless.*

This Court's decision in *Vongxay* is not "clearly irreconcilable" (Op. Br. at 49) with *Bruen*—as explained above, it is consistent with *Bruen*, and did not employ the means-end scrutiny that *Bruen* rejected. *See Vongxay*, 594 F.3d at 1115-18. Butts concedes as much. *See* Op. Br. at 50.

Butts argues, however, that *Bruen* "showed that *Heller*'s list of 'presumptively lawful' exceptions are not binding," Op. Br. at 53, and, accordingly, that *Vongxay* is irreconcilable with *Bruen* because it did not "conduct[] a full – or any – historical analysis," and relied instead on pre-*Heller* precedent and cases applying "means-ends" analysis. In three ways, these arguments fundamentally misread *Vongxay*, *Heller,* and *Bruen.*

*First*, contrary to Butts's argument (Op. Br. at 51-52), *Heller* did not include concealed carry laws as an example of a presumptively lawful regulation. Instead, the Court's reference to "19th-century courts" upholding "prohibitions on carrying concealed weapons" occurred in the prior sentence, not the sentence enumerating examples of "presumptively lawful regulatory

measures," such as felon dispossession. 554 U.S. at 627 & n.26.

Indeed, when *Vongxay* quotes from that paragraph of *Heller*, it elides the sentence regarding concealed weapons as irrelevant to its analysis.

Moreover, *Bruen* did not invalidate prohibitions on carrying concealed weapons. Instead, *Bruen* struck down general bans on carrying firearms "in public," 142 S. Ct. at 2135, and explained that historically, states "could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Id.* at 2150. *Bruen* did not in any way revisit *Heller*'s recognition that felons have no right to bear arms or disturb *Vongxay*'s conclusion that *Heller*'s statement regarding presumptively lawful measures was "integral" to its holding and not dicta. 594 F.3d at 1115.

*Second*, Butts misunderstands the full import of *Vongxay*'s analysis. As discussed above, *Vongxay* recognized that *Heller*'s core holding was that Heller had the right to keep a loaded firearm in his home for self-defense, "provided he was not disqualified from the exercise of Second Amendment rights." 594 F.3d at 1115 (quoting

19

*Heller*, 554 U.S. at 635 (quotation marks omitted)). *Vongxay* then traced "how such a disqualification could occur" to *Heller*'s discussion of the limits of the right to bear arms and concluded that "felons are categorically different from individuals who have a fundamental right to bear arms." 594 F.3d at 1115. The Court found that understanding bolstered, not only by both pre- and post-*Heller* caselaw, but by historical analysis as to felons' "exclu[sion] from the right to arms." *Id.* at 1118 (quoting Reynolds, 62 Tenn. L.Rev. at 480).

This analysis is entirely consistent with *Bruen*'s threshold inquiry into whether "the Second Amendment's plain text covers an individual's conduct," 142 S. Ct. at 2126, which, as this Court has explained, requires "textual analysis, determining whether the challenger is 'part of "the people" whom the Second Amendment protects.'" *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023). Indeed, *Bruen* itself makes clear by framing the second part of the test as "how and why the regulations burden *a law-abiding citizen's* right to armed self-defense,'" that—consistent with *Vongxay*—regulations that disarm only non-law-abiding individuals

20

are properly weeded out at the threshold stage. *Bruen*, 142 S. Ct. at 2132-33 (emphasis added). The fact that Butts wishes the Court undertook a different textual and historical analysis, or even the fact that other courts have come to different conclusions on that point, does not make the precedent any less binding.

*Third*, *Vongxay* did not improperly rely on cases holding that the Second Amendment protected a collective rather than individual right or applying means-ends scrutiny. (Op. Br. at 53.) *Vongxay* cited *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), only to explain its pre-*Heller* precedent, and cited *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005), for the proposition "that § 922(g)(1) does not violate the Second Amendment rights of a convicted felon." *Vongxay*, 594 F.3d at 1116. That holding was correct—even if, as *Vongxay* acknowledged, the reasoning was wrong—and this Court correctly explained why *Heller* did not disturb that holding. *Id.* at 1116-18. Indeed, in a later decision, this Court expressly rejected the argument that *Vongxay* somehow invalidated itself by citing pre-*Heller* precedent. *Phillips*, 827 F.3d at 1174 n.1.

Moreover, *Vongxay* does not refer to, much less apply, a "means-end test" to hold that § 922(g)(1) is constitutional. (AOB 26-27.) That *Vongxay* cited *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004), does not mean this Court engaged in means-end scrutiny rejected by *Bruen*. Rather, the Court cited *Everist* as an example from its "examination of cases from other circuits and of historical gun restrictions [that] lends credence to the post-*Heller* viability of" its previous conclusion that § 922(g)(1) is constitutional. *Vongxay*, 594 F.3d at 1116-17.

Accordingly, *Vongxay* and its progeny constitute controlling circuit precedent that § 922(g)(1) is constitutional as applied to felons—nonviolent or otherwise. A circuit panel may disregard circuit precedent only when "the reasoning or theory of [the] prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003). The fact that *Bruen* rejected an analysis that *Vongxay* did not deploy—means-end scrutiny—does not mean that

*Bruen* "effectively overruled" *Vongxay*. *Miller*, 335 F.3d at 893.[3]

*Vongxay* remains binding precedent, and it forecloses Butts's

argument.

> ### B. Even if *Bruen* Had Abrogated this Court's Precedent, Butts cannot Show that 18 U.S.C. § 922(g)(1) is Facially Unconstitutional.

Butts devotes nearly his entire argument to his facial challenge

to 18 U.S.C. § 922(g)(1). (Op. Br. at 14-69.) To succeed on such a

challenge, he must show that there is no set of circumstances under

which the statute can constitutionally be applied. *Salerno*, 481 U.S.

at 746. In this case, that means even as applied to those who

committed felonies demonstrating an unacceptable risk of danger

---

[3] In *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), the Tenth Circuit recently reaffirmed the binding nature of its pre-*Bruen* precedent upholding the constitutionality of 18 U.S.C. 922(g)(1), *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009). Like *Vongxay*, *McCane*, "relied solely on this language from *Heller*, reasoning that the Supreme Court had appeared to recognize the constitutionality of longstanding prohibitions on possession of firearms by convicted felons." *Vincent*, 80 F.4th at 1201. The court held that, "[g]iven the six Justices' reaffirmation of the *Heller* language and the Court's apparent approval of 'shall-issue' regimes and related background checks, we conclude that *Bruen* did not indisputably and pellucidly abrogate our precedential opinion in *McCane*." *Id.* at 1202.

with a firearm.  Considering the Second Amendment's text and history, he cannot succeed on such a challenge.

The Second Amendment guarantees an individual right to possess and carry arms for self-defense.  But as the Supreme Court has repeatedly emphasized, "the right secured by the Second Amendment is not unlimited."  *Heller*, 554 U.S. at 626; *Bruen*, 142 S. Ct. at 2128; *McDonald*, 561 U.S. at 786.

*Bruen* adopted a two-part test "rooted in the Second Amendment's text, as informed by history" to define the contours of the right to bear arms:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, ... the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S. Ct. at 2126 (citation omitted).

This Court has recently articulated the application of this test in *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).  As the Court explained, "*Bruen* step one involves a threshold inquiry" requiring "textual analysis, determining whether the challenger is

24

'part of "the people" whom the Second Amendment protects,' whether the weapon at issue is '"in common use" today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment." *Id.* (quoting *Bruen*, 142 S. Ct. at 2134-35).

If the first step is satisfied, the second step requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation." *Id.* (quoting *Bruen*, 142 S. Ct. at 2130). As the Ninth Circuit explained, "to carry its burden, the government must produce representative analogues to demonstrate that the challenged law is consistent with a historical tradition of regulation." *Id.* The analogue must be "'relevantly similar' as judged by 'at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2132-33).

A close examination of the historical record demonstrates that the Second Amendment does not prevent Congress from banning

firearm possession by felons. Section 922(g)(1) comports with the Nation's historical tradition of firearms regulation.[4]

> *1. Supreme Court precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens.*

As discussed above, *Heller*, *McDonald*, and *Bruen* make clear that the Second Amendment protects only law-abiding, responsible citizens. Many aspects of Second Amendment doctrine rest on this premise. In judging whether a modern firearms regulation is consistent with a historical precursor, a court must ask "how and why the regulations burden a *law-abiding* citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133 (emphasis added); *Alaniz*, 69 F.4th at 1128. In judging whether a weapon is dangerous and unusual, a court must consider whether the weapon is "typically possessed by *law-abiding* citizens for lawful purposes." *Heller*, 554

---

[4] The Supreme Court will address the constitutionality of § 922(g)(8), which prohibits possession of firearms by individuals subject to domestic violence restraining orders, in *United States v. Rahimi*, No. 22-915. The similar historical tradition at issue in *Rahimi* is relevant here. Oral argument was held in *Rahimi* on November 7, 2023. Although *Rahimi* concerns a different subsection of § 922, the Supreme Court's decision in that case will likely provide guidance to this Court's analysis of § 922(g)(1).

U.S. at 625 (emphasis added).  And States may require applicants for gun permits to pass background checks and take safety courses because such requirements ensure that those who carry guns "are, in fact, '*law-abiding*, responsible citizens.'"  *Bruen*, 142 S. Ct. at 2138 n.9 (citation omitted) (emphasis added).  Those principles reflect the understanding that the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens.

> ### 2. The historical understanding of the right to bear arms confirms that Congress may disarm persons who are not law-abiding, responsible citizens.

The Second Amendment's history illuminates its meaning.  *See Bruen*, 142 S. Ct. at 2128-2129.  Because the Amendment "codified a right inherited from our English ancestors," a court should begin with English law.  *Id.* at 2127 (citation omitted).  Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," a court should also consider evidence of how the Founding generation understood the right.  *Id.* at 2136 (citation and emphasis omitted).  And because evidence of the "public understanding of a legal text in the period after its enactment or ratification" is probative of original meaning, a

27

court should consider how the Second Amendment was understood in the 19th century. *Heller*, 554 U.S. at 605 (emphasis omitted); *see Bruen*, 142 S. Ct. at 2136-2138. Historical evidence from each of those eras—before, at, and after the Founding—leads to the same conclusion: the legislative branch may disarm persons who are not law-abiding, responsible citizens.

**Pre-Founding.** Parliament first recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "several good subjects being Protestants." *Id.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Id.*

While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones. It thus did not displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome." 14 Car. 2, c. 3, § 13 (Eng.). Consistent with the Militia

28

Act, the Crown often directed local officials to disarm those it did not

trust to use weapons responsibly—for instance, those who had

"disturbed the public Peace."[5]  That practice continued after the

adoption of the English Bill of Rights.[6]  Indeed, many 18th-century

---

[5] Privy Council to Lord Newport (Jan. 8, 1661), *in Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d ser., vol. 4, at 156 (1904); *see, e.g.*, *Calendar of State Papers, Domestic Series, Charles II, 1661-1662*, at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); *Calendar of State Papers, Domestic Series, 1670*, at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, May 1, 1684–February 5, 1685*, at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (same).

[6] *See, e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700-8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report*, Appendix, Part IV 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report*, Appendix, Part VI 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[7]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S. Ct. at 2139-2142. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, with violations punishable by forfeiture of the weapons.[8] The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms.

The understanding that the government could lawfully disarm irresponsible subjects remained intact at the time of the American Revolution. For example, in 1780, London officials reacted to

---

[7] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[8] *See, e.g.*, 4 William Blackstone, Commentaries on the Laws of England 149 (10th ed. 1787); 1 Richard Burn, The Justice of the Peace, and Parish Officer 13-14 (2d ed. 1756); 1 William Hawkins, A Treatise of the Pleas of the Crown 135 (1716).

30

widespread rioting by confiscating rioters' arms. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-131 (1994). The House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. *See id.* at 131-132. Members defended confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character."[9] The press similarly distinguished "the riotous mob" from "citizens of character."[10] And private groups that supported the right to bear arms warned that the confiscation did not set a precedent for disarming "peaceable Subjects."[11]

---

[9] *See, e.g.*, 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id.* at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").

[10] 49 *The London Magazine or Gentleman's Monthly Intelligencer* 518 (Nov. 1780); *see, e.g.*, 42 The Scots Magazine 419 (Aug. 1780) (distinguishing "suspicious persons" from "reputable citizens").

[11] *See* 2 *The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780*, at 139 (1780) (resolutions adopted in York); 1 *The Remembrancer; or Impartial Repository of Public*

In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and responsibly. Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, that background strongly suggests that the Second Amendment likewise allows Congress to disarm individuals who are not law-abiding, responsible citizens.

**Founding era.** Many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." In 1780, for example, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966). The town explained: "we esteem it an

---

*Events, for the Year 1781*, at 24 (1780) (resolutions adopted in Middlesex); id. at 112 (resolutions adopted in Huntingdonshire).

essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Law-full Subjects of Government* we Ought Never to be deprived of them." *Id.* (emphasis added).

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention. They proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, *unless for crimes committed, or real danger of public injury from individuals.*" 2 *The Documentary History of the Ratification of the Constitution (Documentary History)* 598 (Merrill Jensen ed., 1976) (emphasis added). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential," *Heller*, 554 U.S. at 604. A contemporary commentator, discussing the proposal, agreed that Congress should have the power to disarm individuals who posed a "real danger of public injury." Nicholas Collin, *Remarks on the Amendments to the Federal Constitution . . . by a Foreign Spectator*, No. 11 (Nov. 28, 1788), *in*

33

*Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights* 40 (Stanton D. Krauss ed., 2019).

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-605. The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

**Post-Founding.** Antebellum commentators shared the Founding generation's understanding of the Second Amendment's scope. Not every commentator who discussed the right specifically addressed the government's power to disarm certain individuals—just as not every commentator specifically discussed its power to prohibit dangerous and unusual weapons or to bar carrying weapons in sensitive places. But the commentators that did address the issue

confirmed that the government may disarm those who are not responsible or law-abiding.

For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one *who entitles himself by his demeanor* to the protection of his country." *Id.* (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage Men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

35

Opponents of slavery voiced similar views during the Bleeding Kansas conflict of the mid-1850s. On the one hand, they supported disarming groups responsible for violence in Kansas. Senator (and future Vice President) Henry Wilson, for instance, complained that "armed bandits" were "violating law, order, and peace," and called for legislation "to disarm any armed bands, from the slave States or the free States, who enter the Territory for unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856). Senator Benjamin Wade likewise called on Congress to "[d]isarm these lawless bands." *Id.* at 1091. On the other hand, opponents of slavery criticized Kansas authorities for disarming "peaceable" free-state settlers.[12] A petition published in William Lloyd Garrison's newspaper even urged the impeachment of President Pierce for his efforts to disarm "peaceable citizens." A.J. Grover, *Impeachment of*

---

[12] *See, e.g.*, New-York Daily Tribune, Oct. 2, 1856, at 4 ("When [a Kansas official] entered the houses of peaceable citizens and demanded that they should deliver up their arms, he . . . violated one of those provisions of the Constitution which a free people should guard with the most jealous care."); *High-Handed Outrage in Kansas*, Holmes County Republican, Oct. 30, 1856, at 1 (denouncing the disarmament of "[p]eaceable American [c]itizens" in Kansas as a violation of their "constitutional rights").

*Franklin Pierce* (Aug. 1, 1856), *in* The Liberator, Aug. 22, 1856, at 140.

Sources from during the Civil War reflect the same understanding. In 1863, a Union general ordered that "all loyal and peaceable citizens in Missouri will be permitted to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), *in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888). And after the war, Senator Henry Wilson defended Congress's "power to disarm ruffians or traitors, or men who are committing outrages against law or the rights of men." Cong. Globe, 39th Cong., 1st Sess. 915 (1866).

As Reconstruction began, many southern States sought to disarm Black citizens, prompting "an outpouring of discussion" about the right to keep and bear arms. *Heller*, 554 U.S. at 614. Participants in that discussion affirmed the right to possess arms for self-defense, yet cautioned that the right protected only "peaceable" or "well-disposed" citizens. In Georgia, for example, the Freedmen's Bureau issued a circular explaining that "[a]ll men, without

37

distinction of color, have the right to keep arms," but that "[a]ny person, white or black, may be disarmed if convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866). The Bureau also recognized that the "freedmen of South Carolina have shown by their peaceful conduct that they can safely be trusted with fire-arms." H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866). And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-909.

Commentators continued to interpret the Second Amendment the same way later in the century. One newspaper article argued that "pistols cannot safely be committed to every irresponsible hand," that the Constitution does not protect "the right of every drunken loafer to bear about in his pocket the implements of murder," and that the right instead belongs only to those "whom it was safe to trust with firearms." *The Sale of Pistols*, New York Times, June 22, 1874, at 4.

All in all, post-ratification sources point in the same direction as English and Founding Era sources. Although different commentators used different terms—"peaceable," "well-disposed," and so on—they recognized that a legislature could disarm those who were not law-abiding, responsible citizens.

> ### 3. The Nation has a long tradition of disarming persons who are not law-abiding, responsible citizens.

"[T]his Nation's historical tradition of firearm regulation" further illuminates the Second Amendment's scope. *Bruen*, 142 S. Ct. at 2126. And the United States has a longstanding tradition, dating to colonial times and continuing to the present, of disarming persons whom legislatures have found are not law-abiding, responsible citizens.

Most relevant here, early American legislatures denied arms to classes of individuals considered unfit to possess them. When the Revolutionary War began, for example, the Continental Congress

recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic.[13]

Colonies and early States also punished irresponsible use of arms with forfeiture of the arms. Early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 5 Pet. 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[14] Some 17th- and 18th-century

---

[13] *See* 4 *Journals of the Continental Congress 1774-1789*, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).

[14] *See, e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's*

American statutes expressly recodified that rule.[15]  Others made

forfeiture part of the penalty for offenses such as unsafe storage of

guns or gunpowder.[16]  Although those laws involved forfeiture of

arms involved in an offense, rather than bans on possessing arms,

they show that legislatures could restrict an individual's ability to

bear arms if his conduct suggested he would not use them

responsibly.

---

*Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[15] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[16] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland*, 1638-1674, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, §1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

A few decades later, states began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 142 S. Ct. at 2148 n.23 (collecting statutes). Those laws, too, confirm that irresponsible individuals were subject to special restrictions that did not (indeed, could not) apply to ordinary, law-abiding citizens. *See id.* at 2122 (holding a proper-cause requirement unconstitutional as applied to ordinary citizens).

Continuing in the 19th century, as guns became more lethal and more widely available, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms. At least 29 jurisdictions banned or restricted the sale of firearms to, or the

42

possession of firearms by, individuals below specified ages.[17]  Several

States banned the sale of guns to persons of unsound mind.[18]  At

least a dozen States disarmed "tramps"—that is, vagrants.[19]  Some

_____

[17] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, §2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[18] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[19] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act

States forbade intoxicated persons from buying or carrying guns.[20]
One State forbade the carrying of arms by "any person who has ever
borne arms against the government of the United States."[21]  Another
disarmed certain individuals in identified categories if they were "not
known to be peaceable and quiet persons."[22]

State courts upheld such laws on the ground that the
disqualified individuals were apt to use arms irresponsibly.  The
Missouri Supreme Court, for example, upheld a ban on carrying

---

of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880,
ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964
(1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of
May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar.
12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12,
1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa.
Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves
110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30;
Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[20] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25;
Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev.
Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329,
§ 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

[21] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.

[22] *See* Act of Apr. 30, 1855, §§ 1-2, in 2 *The General Laws of the
State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore
H. Hitchell ed., 1865).

arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468,469 (1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900).

The tradition of disarming unfit persons continued into the 20th century. In the 1930s, Congress disqualified violent criminals, fugitives from justice, and persons under felony indictment. *See* Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251. In the 1960s, Congress disqualified felons in general, drug users and addicts, and persons with mental illnesses. *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220. In the 1980s, Congress disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces. *See* Firearms Owners' Protection Act, Pub. L. No. 99-308,

§ 102(5)(D), 100 Stat. 452. And in the 1990s, Congress disarmed persons subject to domestic-violence protective orders, *see* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110401(c), 108 Stat. 2014, and domestic-violence misdemeanants, *see* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A, Tit. I, Sec. 101(f) [tit. VI, § 658(b)(2)], 110 Stat. 3009-372. That series of statutes reflects Congress's longstanding judgment that "firearms must be kept away from persons . . . who might be expected to misuse them." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983).

In short, from the earliest days of the Republic to modern times, legislatures have disarmed individuals who could not be trusted with firearms. Different legislatures have disarmed different groups at different times, but those disqualifications all reflect the same enduring principle: the Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens.

### 4. Section 922(g)(1) Complies with the Second Amendment.

As set forth above, the Nation has a lengthy historical tradition of disarming individuals who are not law-abiding, responsible

citizens. Section 922(g)(1), which prohibits possession of firearms only by people convicted of serious crimes—i.e., those punishable by imprisonment for more than one year—is entirely consistent with that tradition.

First, felons do not fall within "the people" protected by the Second Amendment, a term that *Heller* said refers to "members of the political community." *Heller*, 554 U.S. at 580. From the founding to the present, legislatures historically retained wide latitude to exclude felons from the political community. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *id.* at 616, "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"— including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868); *see also Kanter v. Barr*, 919 F.3d 437, 446 n.6 (7th Cir. 2019). Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *Cooley*, *supra*, at 29, as well

as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998).

This remains true today. "The commission of a felony often results in the lifelong forfeiture of a number of rights" tied to membership in the political community, including "the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019); *see also McCane*, 573 F.3d at 1049 (Tymkovich, J., concurring) (noting in a § 922(g)(1) case that felons also "lose out on fundamental rights such as voting and serving on juries, and face discrimination that need only survive rational basis review"); *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) ("[H]istory supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society."). This reality aligns with this Court's view that "most scholars of the Second Amendment agree that the right to bear arms was inextricably tied to the concept of a 'virtuous citizenry' that would protect society through defensive use of arms against

48

criminals, oppressive officials, and foreign enemies alike, and that the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)." *Vongxay*, 594 F.3d at 1118 (cleaned up).

Contrary to Defendant's contention (Op. Br. at 23), the term "people" need not have the same scope in the Second Amendment that it does in the First and Fourth Amendments. When discussing the ambit of the Second Amendment, the Supreme Court initially described the right as belonging to "all members of the political community." *Heller*, 554 U.S. at 580. But the Court made this comment in the context of concluding that the Amendment confers "an 'individual right,' unrelated to service in militia." *United States v. Torres*, 911 F.3d 1253, 1259 (9th Cir. 2019) ("[T]he *Heller* decision did not resolve *who* had the Second Amendment right; *Heller* resolved if there were an individual right per se under the Second Amendment." (emphasis in original)). As described above, the Court went on to define the right as belonging to "law-abiding, responsible citizens," *id.* at 635, and repeated that definition in *Bruen*, *e.g.*, 142

49

S. Ct. at 2122, 2156.[23]  Butts urges this Court to ignore the Supreme

Court's consistent interpretation of the right to bear arms as one

belonging to "law-abiding" citizens (Op. Br. at 26-30), but neither

*Heller* nor *Bruen* provide any basis for doing so.

Second, the historical severity of punishments for felony

offenses supports the conclusion that disarmament of felons as a

class is consistent with the Nation's historical tradition.  For

centuries, felonies have been "the most serious category of crime,"

*Medina*, 913 F.3d at 158, resulting in "forfeiture of property and

rights," *Mai v. United States*, 974 F.3d 1082, 1093 (9th Cir. 2020

---

[23] *Heller* also made clear, despite the "strong presumption that
the Second Amendment right . . . belongs to all Americans," that
"felons" and the "insane" can be "disqualified from the exercise of
Second Amendment rights."  554 U.S. at 631, 635.  This
interpretation that the right is individual but subject to qualification
is consistent with the Constitution's use of "the People."  Article I, for
example, provides that the members of the House of Representatives
will be chosen "by the People of the several States," immediately
providing the limitation that electors will have the "Qualifications
requisite for Electors" of the state legislature.  U.S. Const. Art. I, § 2.
As discussed above, the history of the right to bear arms is replete
with disqualifications for groups excluded from the political
community for various reasons.  *Cf. Heller*, 554 U.S. at 580
(identifying the right as belonging to "members of the political
community").

(Bumatay, J., dissenting). In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769).

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) around the time of the founding. *See Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020) (discussing history of felony punishments). Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See An Act for the*

51

Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes) (noting that statutes calling for forfeiture of estate upon conviction "were in vogue" during the Revolutionary War).

The "widespread, continued condemnation of felons to death, including those who committed non-violent offenses, demonstrates that in 1791 Americans understood felons, as a group, to commit serious crimes." *Folajtar*, 980 F.3d at 905. It is also compelling evidence that "framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead." Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1587 (2022). Likewise, it is telling that early legislatures "authorized punishments that subsumed disarmament— death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property." *Jackson*, 69 F.4th at 503. Thus, "it is difficult to conclude that the public, in

1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.

> ### 5. Disarmament was not historically limited to "violent" or "dangerous" individuals.

The historical record demonstrates that disarmament was not limited to "violent" or "dangerous" felons. *See Folajtar*, 980 F.3d at 908-10 (reviewing historical evidence and concluding that such disqualification was not limited to dangerousness); *Medina*, 913 F.3d at 159 ("The historical evidence and the Supreme Court's discussion of felon disarmament laws leads us to reject the argument that non-dangerous felons have a right to bear arms."); *Jackson*, 69 F.4th at 502 ("Given the[] assurances by the Supreme Court, and the history that supports them, we conclude there is no need for felony-by-felony litigation regarding the constitutionality of §922(g)(1).").

In England, Parliament's authority to disarm classes of people who (in its view) could not be depended upon to obey the law was well established. As noted above, in 1689, the same Parliament that "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554

53

U.S. at 593), also passed an "Act for the better secureing the Government by disarming Papists and reputed Papists," 1 W. & M., Sess. 1, ch. 15, 6 Statutes of the Realm 71.  That Act provided that any Catholic who refused to make a declaration renouncing his faith could not "have or keepe in his House or elsewhere" any "Arms Weapons Gunpowder or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)."  *Id.* at 72.

The American colonies enacted similar laws.  For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of allegiance to the sovereign."  *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotation marks omitted).  And during the French and Indian War, Virginia imported the English tradition of disarming Catholics who refused to take a loyalty oath.  *See* 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 35-39 (1820) (1756 Va. law).  Like the English law discussed above, the Virginia statute tied disarmament to failure to take a loyalty oath and exempted those who took the oath.  *Id.* at 38.  Maryland and

Pennsylvania similarly confiscated firearms from Catholics. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

As the Eighth Circuit recognized, "[w]hile some of these categorical prohibitions of course would be impermissible today under other constitutional prohibitions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503. These prohibitions make clear that the "pre-existing right" codified in the Second Amendment, *Heller*, 554 U.S. at 592, allowed legislatures the power and discretion to use status as a basis for disarmament without individual determinations of danger.

Similarly, during the Revolutionary War, American legislatures passed numerous laws disarming non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact—often specifically targeting those who failed to demonstrate loyalty to the new American government. *Folajtar*, 980 F.3d at 908 ("[O]ther colonies did not

require violence or dangerousness for disarmament."). An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law). And in 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the governments enacted similar legislation—disarming the "disaffected" who refused to take an oath of allegiance to those states. *See, e.g.*, 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law).

Pennsylvania's statute offers a particularly clear rebuttal to the claim that only dangerous felons could be disarmed. Pennsylvania's

56

state constitution protected the people's right to bear arms, *see Heller*, 554 U.S. at 601, but its statute nonetheless provided that all white males over eighteen must swear to "be faithful and bear true allegiance to the commonwealth of Pennsylvania as a free and independent state," and that those who failed to take the oath—regardless of dangerousness or propensity for violence—"shall be disarmed" by local authorities.  9 *The Statutes at Large of Pennsylvania from 1652-1801*, 110, 111, 112-13, § 3 (William Stanley Ray ed., 1903).  Pennsylvania thus deprived sizeable numbers of pacifists of the right to bear arms, because oath-taking violated Quakers' and others' religious convictions.  *See* Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51 (2006)).  *See also Heller*, 554 U.S. at 590 ("Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever."); *cf. Folajtar*, 980 F.3d at 908, n.11 (explaining "[r]efusing to swear an oath" does not "qualify as dangerous").

In sum, the disarmament measures adopted during the Republic's early period reflect that legislatures were understood to have the authority and broad discretion to decide when disobedience with the law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms.

Finally, the ratification debates leading up to the enactment of the Constitution confirm this understanding that legislatures had the power to disarm groups that could not be trusted to follow the law. Specifically, three of the 13 states proposed amendments "limiting the right to bear arms to both law-abiding and 'peaceable' citizens." *Folajtar*, 980 F.3d at 908 (emphasis in original); *see also Medina*, 913 F.3d at 159. In Pennsylvania, and as noted above, the Antifederalists proposed a constitutional amendment providing that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." Schwartz, *supra*, at 665 (emphasis added, reproduced at *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (Sykes, J., dissenting)). Again, that illustrates the founding generation's recognition that "crimes committed"—violent or not—could supply an

independent ground for a legislature to prohibit firearm possession.
*See, e.g.*, *Medina*, 913 F.3d at 158-59 ("The use of the word 'or'
indicates that criminals, in addition to those who posed a 'real
danger' . . . were proper subjects of disarmament."). Similar
proposals were adopted at the ratifying conventions of
Massachusetts and New Hampshire. 2 Schwartz, *supra*, at 675, 681,
758, 761.

The fact that the Second Amendment did not adopt the wording
of those proposals does not undermine their significance. To the
contrary, their significance, as *Heller* explained, lies in revealing the
nature of the right as it was understood at the time. *See* 554 U.S. at
604 (relying on the Pennsylvania, Massachusetts, and New
Hampshire proposals to conclude that they "plainly" and
"unequivocally referred to individual rights"). Not all limitations are
explicit. *See, e.g.*, *id.* at 635 ("obscenity, libel, and disclosure of state
secrets," fall outside the scope of the First Amendment). It would
have been "'obvious'" to the founders that certain groups, including
(but not necessarily limited to) "'the felon,'" *Kanter*, 919 F.3d at 446
n.6 (quoting Cooley, supra, at 29), could properly be subject to

disarmament laws consistent with the "pre-existing right" that was "codified" in the Second Amendment. *Bruen*, 142 S. Ct. at 2127. *See also Heller*, 554 U.S. at 592; Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood").

### 6. Section 922(g)(1) is relevantly similar to historical laws regulating firearms.

The historical laws discussed above demonstrate § 922(g)(1)'s constitutionality. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791," and explained that courts should "reason[] by analogy—a commonplace task for any lawyer or judge." *Bruen*, 142 S. Ct. at 2132. As discussed above, a court should ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Put another way, the "central considerations" are "whether modern and historical regulations

60

impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133 (emphasis and quotation marks omitted).

Under the first metric, § 922(g)(1) imposes no "burden [on] a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. "[C]onviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment." *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017). Moreover, the burden imposed on the felon's rights is comparable to historical laws disarming the untrustworthy and less severe than many historical felony-punishment laws, which often included the death penalty, forfeiture of one's property, and disqualification from political rights.

Furthermore, the modern and historical laws are "comparably justified." *Bruen*, 142 S. Ct. at 2133. The historical laws sought to punish felons and deter re-offending, as well as to protect society from the untrustworthy. Section 922(g)(1) serves a more limited but equally justified purpose. *See Jackson*, 69 F.4th at 505 ("Congress prohibited categories of presumptively dangerous persons from

61

transporting or receiving firearms because they posed an unacceptable risk of dangerousness." (quotation marks and citations omitted)). It seeks to protect society from gun violence committed by felons, who have previously shown disregard for society's laws and are more likely to reoffend, potentially in dangerous ways.

Butts's claim that § 922(g)(1) is inconsistent with the Nation's history of firearm regulation because it was not enacted until the 19th century (Op. Br. at 37-40) misunderstands *Bruen*'s historical inquiry. *Bruen* emphasized that the government need only identify a "historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). "[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* As explained above, § 922(g)(1) and the historical laws are "relevantly similar," *id.* at 2132, because the historical laws imposed severe consequences on the commission of a felony and authorized legislatures to disarm untrustworthy people.

Moreover, the lack of an identical historical statute does not suggest that the founding generation would have viewed § 922(g)(1) as violating the Second Amendment. As one district court recently

62

observed, a "list of the laws that happened to exist in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically believed to be permissible by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (emphasis in original). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority.

Butts latches on to a single sentence in *Bruen* to argue that the government "cannot defend § 922(g)(1) through 'analogical reasoning' and the 'relevantly similar' test." (*See* Op. Br. at 37 n.3.) Specifically, in discussing how courts should proceed with evaluating whether a modern firearm restriction is consistent with the Second Amendment's text and history, the Court stated that, in some cases, the inquiry would be straight-forward—"[f]or instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing the problem is relevant evidence that the challenged regulation is inconsistent with the Second

63

Amendment." *Bruen*, 142 S. Ct. at 2131. The Court did not define "general societal problem" or "distinctly similar," but as this Court has made clear, the Supreme Court did not lay out a "dual-track" standard with a stricter test for statutes aimed at long-standing problems. *See Alaniz*, 69 F.4th at 1128. Instead, the Court was merely providing examples of how its historical test might apply. Despite *Bruen* itself involving a statute aimed at a long-standing issue—public carry—the opinion never again mentions a "distinctly similar" requirement separate from the "analogical reasoning" discussed at length. *Id.* at 2132-33.

More importantly, however, Butts simply ignores the clear instruction of both the Supreme Court and this Court that the question at *Bruen* step two is the comparison between historic and modern regulation as to "how and why the regulations burden *a law-abiding citizen's* right to self-defense." *Alaniz*, 69 F.4th at 1128. Butts makes no effort to show that § 922(g)(1) imposes a greater burden on law-abiding citizens' firearm possession than regulations addressing other groups deemed dangerous or excludable from the political community.

As the Eighth Circuit explained in *Jackson*, 69 F.4th at 504, whether the historic record is viewed as allowing disqualification based on the threat posed to an orderly society and compliance with legal norms, or based on risk of dangerousness, disarming those that have committed serious crimes are relevantly analogous: "Legislatures historically prohibited possession by categories of people based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed," and "[i]n reasoning by analogy from that history, 'the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2132).

In sum, § 922(g)(1) comports with the Nation's historical tradition of firearm regulation; Butts cannot show the statute is unconstitutional on its face or as applied to him.

> **C. Because his convictions include offenses showing of the potential to misuse firearms, Butts cannot show 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him.**

As noted above, Butts devotes only three pages of his brief to his as-applied challenge. (Op. Br. 60-62.) In doing so, he adds little to his facial arguments. As the district court summarized with

65

respect to his as-applied argument below, it appears that his contention is that "possession of guns at his residence for the purpose of hunting" renders his possession constitutional. *See* ER-5.

There is little question after *Heller* that the Second Amendment protects a law-abiding citizen's possession of firearms in his home, whether for hunting or self-defense. Even when addressing firearm possession for self-defense, however, which it deemed the core of the right to bear arms, *Heller* concluded that "felons" among others could be "disqualified from the exercise of Second Amendment rights." 554 U.S. at 635. The fact that the purpose of Butts's gun possession here is claimed to be for hunting is constitutionally insignificant. The fact remains that he has been disqualified from such possession because he is not a law-abiding responsible citizen.[24]

Despite passing references to his false statement offense as being non-violent (Op. Br. at 1, 3, 13), Butts makes no argument as

---

[24] If any confirmation of this point were necessary, it is telling that "[e]arly legislatures . . . ordered forfeiture of firearms by persons who committed non-violent hunting offenses." *Jackson*, 69 F.4th at 503 (citing Act of Oct. 9, 1652, *Laws and Ordinances of New Netherland* 138 (1868); Act of Apr. 20, 1745, ch. III, 23 *The States Records of North Carolina* 218-19 (1904)).

to why 18 U.S.C. § 922(g)(1) is unconstitutional as applied to someone with his criminal history.  The fact is that Butts cannot show he is among the class of offenders who Congress could not reasonably conclude posed an unacceptable risk of danger if armed. *See Kurt*, 988 F.2d at 78 (defendant bears the burden of "show[ing] that he was a member of the class arguably unconstitutionally affected by the statute").

Butts was convicted of criminal endangerment under Montana law, which includes the element of "knowingly engag[ing] in conduct that creates *a substantial risk of death or serious bodily injury*." [25] Mont. Code Ann. § 45-5-207 (emphasis added).  Butts's conduct involved creating that risk through the dangerous use of a firearm—

---

[25] Importantly, it is irrelevant that the prohibiting conviction identified in the indictment was Butts's subsequent offense for making a false statement in relation to a firearm purchase for lying about his earlier felony.  As *Kurt* shows, it is Butts's burden to show he is in the group who's rights he wishes to assert.  Nor is it significant that absent Butts's subsequent federal felony his gun rights would have been restored under Montana law.  *See* Mont. Code Ann. § 46-18-810(2).  The fact that the Montana legislature made a different risk assessment does not create a constitutional limit on Congress's ability to disarm those who are not law-abiding.

firing a firearm at a residence.[26]  PSR ⁋40.  The history detailed
above is replete with examples dating before, at, and after the
Founding of disarmament for exactly this type of conduct.  *See, e.g.*,
14 Car. 2, c. 3, § 13 (Eng.) (authorizing disarmament of individuals
judged "dangerous to the Peace of the Kingdome"); *Hogan*, 58 N.E. at
575 ("If [an individual] employs those arms which he ought to wield
for the safety and protection of his country, his person, and his
property, to the annoyance and terror and danger of its citizens, his
acts find no vindication in the bill of rights.").  Butts was so
disarmed.

Despite being informed of this prohibition, Butts later lied to
obtain a firearm—and did so about a month after violating a
protective order for again illegally firing projectiles at a residence,
this time with a slingshot.  PSR ⁋41.  The Seventh Circuit found, in
upholding a challenge to the federal offense of false statement in
relation to a firearm transaction over a post-*Bruen* challenge, that

---

[26] As noted above, Butts's conviction for felony criminal
mischief also involved illegal use of a firearm, that time for
destruction of property.  *See* n.1 *supra*.

68

this felony also involved an unacceptable risk of misuse of a firearm. *Holden*, 70 F.4th at 1018 ("[O]ne might think that the very act of lying to obtain a firearm implies a risk that the weapon will be misused.").

Butts's reference to *Range v. Attorney General*, 69 F.4th 96, 98 (3d Cir. 2023), which involved a misdemeanor punishable by up to five years for making a false statement to obtain food stamps, is inapposite. Butts concedes that his false statement felony was "in a different context," (Op. Br. at 61), but does not acknowledge that the context here was Butts's attempt to obtain a firearm that he was legally prohibited from possessing due to prior dangerous conduct involving a firearm.

Butts simply cannot show that he belongs in any class of non-violent or non-dangerous individuals to assert that § 922(g)(1) might be unconstitutional as applied to them. *Kurt*, 988 F.2d at 78. Restrictions of gun possession based on his prior offenses, which involve dangerous use of firearms and deceit in the attempt to subvert reasonable firearm restrictions, are entirely consistent with

the Nation's history of gun regulation. Such a prohibition puts no burden on a law-abiding citizen's right to bear arms.

### CONCLUSION

The district court should be affirmed.

DATED this 20th day of November, 2023.

Respectfully submitted,

JESSE A. LASLOVICH
United States Attorney

s/ *Timothy A. Tatarka*

TIMOTHY A. TATARKA
Assistant United States
Attorney

## STATEMENT OF RELATED CASES

To the knowledge of counsel, the following appeals raise the same or a substantially similar question as presented here, i.e., whether 18 U.S.C. § 922(g)(1) is constitutional after *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022):

- *United States v. Registe*, No. 20-30042 (oral argument vacated, stayed pending resolution of *United States v. Rojo*, No. 23-598);

- *United States v. Duarte*, No. 22-50048 (oral argument scheduled for December 4, 2023);

- *United States v. Howard*, No. 22-10211 (government's answering brief was filed on October 23, 2023);

- *United States v. Rojo*, No. 23-598 (government's answering was filed on November 17, 2023); and

- *United States v. Martinez*, No. 23-1125 (government's motion to stay filed on November 3, 2023).

DATED this 20th day of November, 2023.

JESSE A. LASLOVICH
United States Attorney

s/ *Timothy A. Tatarka*
TIMOTHY A. TATARKA
Assistant United States Attorney

71

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and the body of the argument contains 13,930 words.

DATED this 20th day of November, 2023.

JESSE A. LASLOVICH
United States Attorney

s/ *Timothy A. Tatarka*
TIMOTHY A. TATARKA
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

JESSE A. LASLOVICH
United States Attorney

s/ *Timothy A. Tatarka*
TIMOTHY A. TATARKA
Assistant United States Attorney