**Ninth Circuit Court of Appeals No. 23-313**
**District Court Number CR 22-33-M-DWM**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**
**Plaintiff-Appellee,**


**-vs-**


**SHAWN LEE BUTTS,**
**Defendant-Appellant.**

---

**REPLY BRIEF OF DEFENDANT-APPELLANT**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

HONORABLE DONALD W. MOLLOY
SENIOR UNITED STATES DISTRICT JUDGE, PRESIDING

RACHEL JULAGAY
Federal Defender, District of Montana
*JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
125 Bank Street, Suite 710
Missoula, MT 59802
(406) 721-6749
        *Counsel for Petitioner-Appellant

SUBMITTED:  February 1, 2024

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................2

I.    18 U.S.C. § 922(g)(1) violates the Second Amendment. ................2

    A.    *United States v. Vongxay*, 594 F.3d 1111, (9th Cir. 2010), does not control; it is clearly irreconcilable with *Bruen* ......................2

    B.    The people includes all citizens. ..........................................7

    C.    Rather than engaging the textual analysis required by this, and the Supreme, Court, the government conducts a historical survey from 1662 to 1968, to finally land (in 1968) on a regulation disarming Mr. Butts ...............................................................14

        1.    English Bill of Rights ..................................................15

        2.    Militia Act. ..................................................................16

        3.    Statute of Northampton ...............................................17

        4.    Confiscation of London rioters' arms in 1780 .........................17

        5.    Town of Williamsburg proposal. ................................17

        6.    Anti-Federalist proposals and one person's political commentary ..................................................................18

        7.    Beginning with an 1840's opinion and ending with 20th Century federal laws does not textually define "the people" at the time of the founding ..........................................18

8. Surety is not a criminalized permanent disarmament...............18

9. The government does not cite to founding era regulations.......19

D. The government fails its burden of showing § 922(g)(1) is consistent with America's tradition of firearms regulation. ...............................20

1. The government applies the wrong legal standard. .................20

2. Even assuming the "relevantly similar" test applies, the government fails its burden.......................................................22

a. Death penalty and forfeiture. ..........................................22

b. Racist and anti-Catholic disarmament...........................24

c. Loyalist disarmament. ....................................................27

d. Rejected proposals from the Second Amendment's drafting history do not satisfy the government's burden to identify a relevantly similar "tradition of regulation."...28

II. As applied, § 922(g)(1) violates Mr. Butts' Second Amendment rights. .....30

CONCLUSION ....................................................................................................34

CERTIFICATE OF COMPLIANCE.......................................................................35

CERTIFICATE OF SERVICE ...............................................................................36

# TABLE OF AUTHORITIES

## TABLE OF CASES

*Afroyim v. Rusk,*
    387 U.S. 253 (1967)...............................................................13

*Carter v. Jury Commission of Greene County,*
    396 U.S. 320 (1970)...............................................................11

*Chisholm v. Georgia,*
    2 U.S. 419 (1793)..................................................................13

*District of Columbia v. Heller,*
    554 U.S. 570 (2008).........................................................passim

*Firearms Pol'y Coal. Inc. v. McCraw,*
    623 F. Supp. 3d 740 (N.D. Tex. 2022)..........................................19

*Gibbons v. Ogden,*
    22 U.S. 1 (1824)....................................................................11

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019)..............................9, 10, 23, 24, 29

*Maryland Shall Issue Inc., v. Moore,*
    86 F.4th 1038 (4th Cir. 2023)......................................................6

*M'Culloch v. State of Maryland,*
    17 U.S. 316 (1819).................................................................13

*McDonald v. City of Chicago, Ill.,*
    561 U.S. 742 (2010)............................................................1, 16

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) (en banc).........................................5

*New York Rifle and Pistol Association v. Bruen*,
    597 U.S. 1 (2022)..................................................................passim

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007)........................................17

*Range v. Attorney General United States of America*,
    69 F.4th 96 (3d Cir. 2023) .............................8, 24, 25, 33

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998).............................................................8

*Trop v. Dulles*,
    356 U.S. 86 (1958)...........................................................14

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023)..................3, 7, 20, 21, 31

*United States v. Conant*,
    116 F.Supp.2d 1015 (E.D. Wis. 2000) ........................11

*United States v. Everist*,
    368 F.3d 517 (5th Cir. 2004) ...........................................4

*United States v. Fetters*,
    2014 WL 7272653 (D. Mont. 2014)..............................33

*United States v. Griffin*,
    2023 WL 8281564 (N.D. Ill. 2023)...............................27

*United States v. Harrison*,
    654 F.Supp.3d 1191 (W.D. Okla. 2023).......................26

*United States v. Jimenez-Shilon*,
    34 F.4th 1042 (11th Cir. 2022).....................................26

*United States v. Pierre*,
    CR 22-20321-JEM (S.D. Fla. 2022)...............................6

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990)..................................................................13

*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010) ............................................... 2-5

*United States v. Younger,*
    398 F.3d 1179 (9th Cir. 2005) ....................................................4

*Voisine v. United States,*
    579 U.S. 686 (2016)....................................................................5

*Young v. Hawaii,*
    992 F.3d 765 (9th Cir. 2021) .................................................4, 30

*Young v. Hawaii,*
    142 S.Ct. 2895 (2022) (granting, vacating, and remanding).........................4

## STATUTES AND RULES

### United States Code

18 U.S.C. § 922(g)(1)............................................................passim

18 U.S.C. § 3581(b) ...................................................................22

### Federal Statutes

For the Punishment of certain Crimes against the United States,
1 Stat. 112 (1790).....................................................................23

Militia Act of 1792, 1 Stat. 271 (1792).....................................24

### British Law (Historic)

1662 Militia Act ................................................................ 16-17

English Bill of Rights......................................................... 15-16

Statute of Northampton...........................................................17

### Supreme Court Oral Argument

*United States v. Rahimi*, No. 22-915 (2023).............................27

### United States Sentencing Guidelines

U.S.S.G. § 2D1.1(b)(1) ............................................................21

U.S.S.G. § 2K2.1(b)(2) ...........................................................32

U.S.S.G. § 4B1.2(2) ................................................................33

U.S.S.G. App. C, Amendment 798, Reason for Amendment .................................33

**United States Constitution**

Article I, § 2 ...................................................................................10

Fourteenth Amendment ...................................................................10

Second Amendment ...................................................................passim

**Other Sources**

Amar, A.
  *The Bill of Rights* (1998) ...............................................................9

Andrews, J. (ed.)
  *The Works of James Wilson* (1896) .............................................23

Bailey, N.
  *A Universal Etymological English Dictionary* (1790) ..................12

Charles, P.
  *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in McDonald v. City of Chicago*
  57 Clev. St. L. Rev. 351 (2009).....................................................16

Churchill, R.
  *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*
  25 Law & Hist. Rev. 139 (2007) ....................................................27

Cornell, S. & DeDino, N.
  *A Well-Regulated Right: The Early American Origins of Gun Control*
  73 Fordham L. Rev. 487 (2004) .....................................................28

Cooley, T.
  *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) .................8, 9

Dyche, T. & Pardon, W.
    *A New General English Dictionary* (14th ed. 1771) .....................................12

Friedman, L.
    *Crime and Punishment in American History* (1993).....................................23

Greenlee, J.
    *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*
    20 Wyo. L. Rev. 249 (2020) ...................................................................25, 28

Johnson, S.
    *A Dictionary of the English Language* (1766) .............................................12

Malcolm, J.
    *To Keep and Bear Arms: The Origins of an Anglo-American Right*
    Harvard University Press (1996) .................................................................15

Marshall, C.
    *Why Can't Martha Stewart Have a Gun?*
    32 Harv. J.l. & Pub. Policy 695 (2009) .......................................................28

Monaghan, H.
    Overbreadth
    1981 Sup. Ct. Rev. 1 (1981) .......................................................................30

Scalia, A. & Garner, B.
    *Reading Law: The Interpretation of Legal Texts* (2012)..............................11

Webster, N.
    *An American Dictionary of the English Language* (1828)...........................12

Wood, G.
    *The Creation of the American Republic 176-1787* (1969).....................12, 13

**Ninth Circuit Court of Appeals No. 23-313**
**District Court Number CR 22-33-M-DWM**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**
**Plaintiff-Appellee,**

**-vs-**

**SHAWN LEE BUTTS,**
**Defendant-Appellant.**

---

**REPLY BRIEF OF DEFENDANT-APPELLANT**

---

## INTRODUCTION

The Supreme Court admonished lower courts to stop treating the Second Amendment like a "'second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)). In order to avoid *Bruen*'s rigorous text-and-history standard, the government ignores this command.

1

## ARGUMENT

### I.   18 U.S.C. § 922(g)(1) violates the Second Amendment.

**A.   *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), does not control; it is clearly irreconcilable with *Bruen*.**

The government argues *District of Columbia v. Heller*, 554 U.S. 570 (2008), limits "the right to keep and bear arms as belonging to 'law-abiding, responsible citizens,'" GB 10 (citing *Heller*, 554 U.S. at 635),  and that *Vongxay* forecloses Mr. Butts' argument.  GB 11-13.

*Bruen*'s analysis, unlike *Vongxay*, does not begin and end with *Heller*'s presumptively unlawful list.  *Bruen* replaced that summarily outcome determinative dicta with a two-part test.  Courts must first determine whether "the Second Amendment's plain text covers [the defendant's] conduct." *Bruen*, 597 U.S. at 24. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct".  *Id*. at 17.  The government cannot point to any textual analysis in *Vongxay*, because there was none.

Faced with *Bruen*'s demands, the government resorts to *Heller*'s presumptively unlawful list, claiming *Heller* "bolstered" this conclusory analysis "by historical analysis as to felons'" disarmament.  GB 20.  Tellingly, though, the government does not detail that historical analysis in *Heller*.  *Heller* omitted any historical founding era inquiry of felon disarmament, explaining "there will be time

2

enough to expound upon the[ir] historical justifications . . . if and when those [regulations] come before us."  554 U.S. at 635.

Given this void in *Heller*, and in *Vongxay*, the government argues *Bruen*'s second test is limited to a "*law-abiding citizen'*s right to armed self-defense"  GB 20 (government italics).  The government maintains that conclusion answers *Bruen*'s textual analysis and forecloses the Second Amendment's plain text from applying to felons.  That reasoning is not textual analysis, and the government never explains how its use of *Bruen*'s second test somehow overrides even conducting the initial, pre-requisite textual analysis.

Moreover, *Bruen*'s second test requires the government to "demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation," *id*., by "identify[ing] a well-established and representative historical analogue" to the modern   prohibition, and "only" then "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*. at 17 (internal quotations and citation omitted).  It is not limited to law-abiding citizens, nor does it incorporate any presumptively unlawful list, exempt from *Bruen*'s two-part test.  *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (implementing  *Bruen*'s two-part test, without identifying any "presumptively unlawful" exceptions).

3

Because *Bruen* had not yet issued, *Vongxay* treated *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), as "control[ling]." *Vongxay*, 594 F.3d at 1116. And *Younger*, in turn, upheld § 922(g)(1) based on two untenable reasons post-*Bruen*: (1) the "Second Amendment does not confer an individual right to possess arms," and (2) "§ 922(g)(1) 'represents a limited and narrowly tailored exception to the freedom to possess firearms, reasonable in its purposes.'" *Id*. at 1192 (quoting *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004) (applying means-end analysis)). That reasoning is clearly irreconcilable with *Bruen*'s holdings that the right is individual and that means-end scrutiny plays no role in Second Amendment analysis. 597 U.S. at 17, 19.

The Supreme Court's grant, vacate, and remand ("GVR") in *Young v. Hawaii*, 142 S.Ct. 2895 (2022), further cements that *Vongxay* is irreconcilable with *Bruen*. In *Young*, 992 F.3d. 765, 783 (9th Cir. 2021) (citations omitted), without the benefit of *Bruen*, this Court ruled: "we may uphold a law without further analysis if it falls within the 'presumptively lawful regulatory measures' that *Heller* identified." *Vongxay* upheld 18 U.S.C. § 922(g)(1), without further analysis, because it fell within *Heller*'s "presumptively lawful regulatory measures." The Supreme Court GVR-ed *Young* for further consideration in light of *Bruen*. The GVR in *Young* establishes *Vongxay*'s irreconcilability with *Bruen*.

4

The government tries to reframe *Bruen*, arguing that *Bruen* "implicitly acknowledged *Heller*'s exclusion of felons from 'the people' protected by the Second Amendment." GB 15. According to the government, this "implicit acknowledgment" authoritatively limits the Second Amendment's definition of "the people" to law abiding citizens. The government argues "[t]his analysis is entirely consistent with *Bruen*'s threshold inquiry into whether 'the Second Amendment's plain text covers individual conduct'". GB 20 (quoting *Bruen*, 597 U.S. at 17).

Implicit acknowledgement is not textual analysis. Implicit acknowledgement is not a historical analysis of distinctly similar founding era regulations. Those are the two tests required by *Bruen*.

*Vongxay* did not engage either test. Its "presumptive unlawful" theory and reasoning is "clearly irreconcilable" with *Bruen*'s "mode of analysis". *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2000) (en banc). Moreover, even Justice Thomas, the author of *Bruen*, rightly understood *Heller*'s "presumptively unlawful" passage as dicta. *See Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting on other grounds) (describing *Heller*'s discussion of felon-disarmament laws as "dicta").

The Court in *Heller* explained that, "*whatever else [the Second Amendment] leaves to future evaluation*, it surely elevates above all other interests the right of

5

law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635 (emphasis added). *Heller* did not hold that *only* law-abiding, responsible citizens enjoy Second Amendment rights. In fact, *Heller* expressly left that question "to future evaluation." *Id*. Similarly, nowhere did *Bruen* say the Second Amendment is limited to law-abiding citizens. *See United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF No. 53 at 17 (S.D. Fla. Nov. 28, 2022) ("[I]t is no surprise that [*Bruen*] used the term 'law-abiding' because that was the factual scenario the Court was considering.").

Finally, the government's speculative justice-vote-counting falls flat. GB 16-17. None of the concurrences or dissents cited by the government displace *Bruen*'s two-part text and history analysis.

The government notes that three justices in the *Bruen* majority joined concurrences citing *Heller*'s dictum about "presumptively lawful" felon-disarmament laws. GB 17. Neither of the *Bruen* concurrences cite temporally-relevant historical evidence to support felon-disarmament laws or explains how such laws comport with the Second Amendment's text. *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1045 n.9 (4th Cir. 2023) ("if we have to choose between the outcome dictated by text, history, and tradition and the outcome hinted at in dicta, it is no contest: Text, history, and tradition wins every time").

6

Like *Heller*'s "presumptively lawful" dictum, the concurrences' references to felon-disarmament laws are "ipse dixit." 554 U.S. at 722 (Breyer, J., dissenting).

**B.     The people includes all citizens.**

"*Bruen* adopted a two-part test 'rooted in the Second Amendment's text, as informed by history'". GB 24. At step one, the Court asks whether "the Second Amendment's plain text covers [the defendant's] conduct." *Bruen*, 597 U.S. at 24. If it does, "the Constitution presumptively protects that conduct." *Id*. The government acknowledges "*Bruen* step one involves a threshold inquiry requiring a textual analysis, determining whether the challenger is part of the people whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed court of conduct falls within the Second Amendment." GB 24-25 (quoting *Alaniz*, 60 F.4th at 1128 (quoting *Bruen*, 597 U.S. 31-33) (cleaned up)).

Without textual analysis, the government believes the term "the people" in the Second Amendment actually means "the law-abiding people". The government doesn't consult any dictionaries of the founding period. It doesn't employ any canons of construction. Instead, the government claims *Bruen* holds that the term "the people" means "the law-abiding people," despite the fact that the meaning of that term was not a disputed issue in *Bruen*. 597 U.S. at 31-32 ("It is undisputed that

7

petitioners Koch and Nash – two ordinary, law-abiding, adult citizens – are part of 'the people' whom the Second Amendment protects.") (citing *Heller*, 554 U.S. at 580)). *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 & n.5 (1998). ("Article III of the U.S. Constitution does not authorize federal courts to decide theoretical questions. . . . It extends the 'judicial Power' only to concrete 'Cases' and 'Controversies.'" ).

In *Range v. Attorney General, United States*, the Third Circuit, post-*Bruen*, rejected the same "law-abiding citizen" argument that the government makes here. 69 F.4th 96, 101-103 (3d Cir. 2023) (en banc). That court was particularly concerned that the "law-abiding, responsible citizens" limitation on "the people" gives power to the legislature to decide the meaning of the Second Amendment, legislative authority rejected by *Heller* and *Bruen*. *Id*. at 102-03.

The government begins its campaign to exclude Mr. Butts from "the people" by arguing he is not part of the political community. The government quotes Thomas Cooley's 1868 treatise to show that "certain classes of people have been almost universally excluded" including "the idiot, the lunatic, and the felon, on obvious grounds." GB 47 (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868)).

8

Cooley makes this statement without any analysis or authoritative citation, other than to claim that the proposition is "obvious." *Id*. at 29. Cooley – writing shortly after the passage of the Equal Protection Clause – similarly claimed that women were not part of "the people" either. *Id*. According to Cooley, women didn't need any of these rights "because in the natural relation of marriage, she was supposed to be, and under the common law actually was, in a condition of dependence upon and subjection to the husband." *Id*.

Regardless, mid-to-late 19th-century commentary, like Cooley's treatise, "come[s] too late to provide insight into the meaning of the [Second Amendment in 1791]." *Bruen*, 597 U.S. at 37. While *Heller* considered such evidence, including Cooley's treatise, as *Bruen* explains, *Heller*'s reliance on these materials was "secondary," cited "as mere confirmation of what [...] had already been established." *Id*.

The government tries to reclassify the Second Amendment as a political right, akin to voting and jury service. GB 48.[1] "[V]irtue exclusions are associated with

---

[1] Akhil Amar's equating of the right to bear arms and the right to vote reflected his belief that both are "political rights." *The Bill of Rights* 48 (1998). But Amar defines political rights as "collective" in nature, *id*. at 37, whereas *Heller* "expressly reject[ed]" the view that the right to bear arms is "collective" rather than individual. *Kanter v. Barr*, 919 F.3d 437, 462-63 (7th Cir. 2019) (Barrett, J., dissenting).

civic rights – individual rights that require citizens to act in a collective manner for distinctly public purposes." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting) (quotation and citation omitted). Voting and jury service involve civic rights, because citizens "cast votes as part of the collective enterprise of self-governance" and serve on juries "as part of the collective enterprise of administering justice." *Id*.

*Heller*, by contrast, cemented the individual right to bear arms and "expressly reject[ed] the argument that the Second Amendment protects a purely civic right." *Id*. at 463. *Heller*'s central holding is that the Second Amendment enshrines an "individual right" that belongs to "all Americans" and does not depend on service in a "corporate body" such as the militia. *Id*. at 610. *Heller* established that when the Second Amendment uses "the people," it "unambiguously refer[s] to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body." 554 U.S. at 579.

Moreover, unlike the express textual limitations on the right to vote recognized in Article I, § 2 and the Fourteenth Amendment – either one of which would be sufficient to deny felons the franchise – there is nothing in the plain text of the Second Amendment to justify felon disarmament laws like § 922(g)(1). That the Constitution includes textual limitations on the right to vote capable of excluding convicted felons reflects the lack of similar restrictions on the right to keep and bear

10

arms was an intentional omission. Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 93-100, 107-11 (2012).

In contrast to the text of the Second Amendment, the Constitution contains no emphatic right or entitlement to sit on a jury. *See Carter v. Jury Commission of Greene County*, 396 U.S. 320, 332 (1970) ("It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors."); *United States v. Conant*, 116 F.Supp.2d 1015, 1020 (E.D. Wis. 2000) ("No court that has considered the question of whether being eligible for jury service is a constitutional right has answered in the affirmative." (collecting cases)).

By diverting to collective rights, the government ignores that *Bruen*'s first step requires "a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language" – in particular, the normal and ordinary meaning at the time the Second Amended was adopted in 1791. 597 U.S. at 20, 34 (quoting *Heller*, 554 U.S. at 576). "[T]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning. Normal meaning … excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576 (internal citations omitted). *See also Gibbons v. Ogden*, 22 U.S. 1, 71 (1824).

11

At that time, the word "people" was commonly understood as extending to "every person" or "the whole Body of Persons" comprising a community or nation:

> People – "signifies every person, or the whole collection of inhabitants in a nation or kingdom." Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771), available at https://tinyurl.com/uk4b4fxd.

> People – "[T]he whole Body of Persons who live in a Country, or make up a Nation." Nathan Bailey, *A Universal Etymological English Dictionary* (1790), available at https://tinyurl.com/4vhm6uad.

> People – "A nation; those who compose a community." 2 Samuel Johnson, *A Dictionary of the English Language* (1766), available at https://tinyurl.com/y95erjwf.

> People – "A nation, the individuals composing a community; the commonalty, the bulk of a nation." 2 John Ash, *The New and Complete Dictionary of the English Language* (2d ed. 1795), available at https://tinyurl.com/ycxhrbep.

> People – "The body of persons who compose a community, town, city or nation," a "word … comprehend[ing] all classes of inhabitants." 2 Noah Webster, *An American Dictionary of the English Language* (1828), available at https://tinyurl.com/mr36h8yx.

As leading Founding-era historian Dr. Gordon Wood noted, this expansive understanding dominated American thinking during the framing and ratifying of our Constitution: "[T]he word 'people' in America had taken on a different meaning from what it had in Europe. In America it meant the whole community and comprehended every human creature in society[.]" G. Wood, *The Creation of the American Republic 1776-1787* 607 (Univ. of N. Carolina Press, 1969).

*Heller* recognized this expansive understanding of the term "the people", holding "the term unambiguously refers to all members of the political community" – "all Americans" – "not an unspecified subset." *Heller*, 554 U.S. at 580-81. In particular, the term refers "to persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

Finally, the government's textual argument fails because it is at odds with the basic structure of the Constitution itself. In our system of government, all sovereignty flows from the people. *M'Culloch v. State of Maryland*, 17 U.S. 316, 404-05 (1819); Wood, *supra*, at 599, 601–05. Informed by the teachings of John Locke and Jean-Jacques Rousseau, the people who framed and ratified our Constitution understood their creation as a social compact, by "We the People" to form a government of limited powers – a government and Constitution to secure and enshrine liberties, not subject them to government fiat. *See Chisholm v. Georgia*, 2 U.S. 419, 471 (1793) (Jay., C.J.); Wood, *supra*, at 283, 600-02.

The government has no authority to ostracize an American citizen from the social compact we the people formed. *Afroyim v. Rusk*, 387 U.S. 253, 257 (1967) ("In our country the people are sovereign and the Government cannot sever its

13

relationship to the people by taking away their citizenship."); *Trop v. Dulles*, 356 U.S. 86, 101-02 (1958) (loss of citizenship is cruel and unusual punishment under the Eighth Amendment because it "strips the citizen of his status in the national … political community," depriving him of "the right to have rights"). It's the people's Constitution, not the government's.

**C.      Rather than engaging the textual analysis required by this, and the Supreme, Court, the government conducts a historical survey from 1662 to 1968, to finally land (in 1968) on a regulation disarming Mr. Butts.**

The government bypasses a textual analysis of the Second Amendment, substituting a historical survey of miscellaneous firearm commentary and sometimes laws. GB 27.  In avoiding the textual analysis required by *Bruen* and proceeding directly to its historical survey, the government collapses *Bruen*'s two-part test.  The government replaces that analytical framework with an historical overview that the government maintains authorizes Congress to disarm felons as "not law-abiding, responsible citizens."  GB 27.

That is not *Bruen*'s step-one textual analysis. Moreover, while the government does not so-delineate it, at step one, it merges into *Bruen*'s step-two analysis. Because the government cannot identify a distinctly similar founding era statute disarming felons, it undertakes an historical gloss of miscellaneous gun laws, failed proposals, military orders, newspaper petitions, circulars, and political commentary.

14

It does not textually establish that Mr. Butts, who indisputably possessed hunting firearms for hunting purposes, is not part of "the people," protected by the Second Amendment.

    1.   <u>English Bill of Rights</u>

The government first tries to avoid textually analyzing the Second Amendment and to avoid identifying specific regulations distinctly similar to § 922(g)(1) by noting the English Bill of Rights only guaranteed arms to Protestants, as "suitable to their Conditions, and as allowed by Law." GB 28. This, the government argues, establishes legislatures may disarm irresponsible citizens. GB 28.

In other words, the government asks this Court to reinstate the "judicial deference to legislative interest balancing" – the English Bill of Rights' "as allowed by law" caveat – that *Bruen* explicitly rejected. 597 U.S. at 26. The fact that the English Bill of Rights deferred to the legislature does not mean that the Second Amendment does too. *Id*.

Moreover, the English right "matured" and expanded by the Founding, with Americans "swe[eping] aside" the English "as allowed by law" limitation. *See id*.; Joyce Lee Malcolm, *To Keep and Bear Arms* 136-37, 162 (1994). The English Declaration contained two explicit limitations on the right to bear arms: (1) it was

restricted to "Protestants," who (2) could have arms only "as allowed by law." If the drafters of the Second Amendment had wanted to limit the arms right to only certain people, they could have imitated the example provided by the well-known English Declaration. But they opted instead for more expansive language that does not exclude any classes of people, even those (like Catholics in 17th century England) who might have been considered dangerous.

    2.    Militia Act

    The government continues its 17th Century England overview, almost 130 years before the Founding, with the 1662 Militia Act, which authorized agents of the state to "'search for and seize all Armes in the custody or possession of any person or persons whom the said [agents] . . . shall judge dangerous to the Peace of the Kingdome.'" Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in McDonald v. City of Chicago*, 57 Clev. St. L. Rev. 351, 356-83 (2009). Mr. Butts is unaware of – and the government does not cite – any statute authorizing similar seizures in the colonies or early republic. *Bruen* disclaimed "[h]istorical evidence that long predates [1791]," and it admonished courts not to "rely on an ancient practice that had become obsolete in England at the

16

time of the adoption of the Constitution and never was acted upon or accepted in the colonies." 597 U.S. at 35.

3.      Statute of Northampton

The Supreme Court considered, and explicitly dismissed, any relevance of the Statute of Northampton.

> Notwithstanding the ink the parties spill over this provision, the Statute of Northampton – at least as it was understood during the Middle Ages – has little bearing on the Second Amendment adopted in 1791. The Statute of Northampton was enacted nearly 20 years before the Black Death, more than 200 years before the birth of Shakespeare, more than 350 years before the Salem Witch Trials, more than 450 years before the ratification of the Constitution, and nearly 550 years before the adoption of the Fourteenth Amendment.

*Bruen*, 597 U.S. at 41.

4.      Confiscation of London rioters' arms in 1780.

*Parker v. District of Columbia*, 478 F.3d 370, 382 n. 8 (D.C. Cir. 2007), explains that, in response to the London riots, the "foremost legal advisor to the city as well as the judge of the Old Bailey", affirmed the rights of Protestants to possess firearms for self-defense.    That self-defense exception alone defeats the government's reliance.

5.      Town of Williamsburg proposal.

A town proposal to amend Massachusetts' constitution does not qualify as "regulation" relevant to understanding the text of the Second Amendment.

17

6.    <u>Anti-Federalist proposals and one person's political commentary</u>.

The Second Amendment text ratified by the States and enshrined in the Constitution trumps defeated Anti-Federalist proposals, *Heller*, 554 U.S. at 590, n. 12, and isolated political commentary.  GB 33.

7.    <u>Beginning with an 1840's opinion and ending with  20th Century federal laws does not textually define "the people" at the time of the founding</u>.

A scholar's 1840 interpretation of the Second Amendment, a state convention resolution in 1842, Washington D.C.'s mayor's rhetoric in 1858, complaints of 1850s opponents of slavery, 1856 calls on Congress, an 1856 newspaper petition, a Civil War military order, a Senator's 1866 statement, Southern reconstruction discussions, a Georgia 1866 circular, an 1866 order in South Carolina, an 1874 newspaper article, late 19th Century laws regarding minors, "unsound minds", "tramps",  and drunk people, and federal statutes in the 1930s and 1960s do not textually define the ratification understanding of the Second Amendment.  GB 35-38, 43-46.

8.    <u>Surety is not a criminalized permanent disarmament</u>.

The government points to surety statutes, beginning in 1836, that required bonds to carry firearms, concluding that these laws confirm "special restrictions" could apply to irresponsible individuals.  GB 42.  The government acknowledges

that 1836 law created an exception for self-defense. *Id*. More broadly, how is "irresponsible" defined?  And a surety bond to carry firearms is not analogous to criminalized permanent disarmament.

      9.    <u>The government does not cite to founding era regulations</u>.

*Bruen* stressed that the proper question in Second Amendment analysis is whether a challenged statute is consistent with the American tradition of firearms "regulation," i.e., of positive law. *See*, *e.g.*, *id*., 597 U.S. at 18, 26, 28, and 34.

In assessing New York's proper-cause requirement, *Bruen* did not inquire into "general Founding-Era attitudes" about firearm use. *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F.Supp.3d 740, 752 (N.D. Tex. 2022).  Instead, the Court asked a much more concrete, empirical question: did founding-era governments "regulate" firearms – that is, proscribe their possession or use by law – in the same way as New York's challenged law? Answering this question required looking to "regulations" (i.e., laws) in force – not vague, abstract theorizing about how people of the founding or later eras viewed firearms. *See Bruen*, 597 U.S. at 46 ("Respondents next point us to the history of the Colonies and early Republic, but there is little evidence of an early American practice of regulating public carry by the general public.").

Here, the government's response does not identify a single statute, before the 20th century, in either England or America, disarming felons in its quest to exclude Mr. Butts from "the people."

**D.    The government fails its burden of showing § 922(g)(1) is consistent with America's tradition of firearms regulation.**

1.    <u>The government applies the wrong legal standard.</u>

*Bruen*'s second test requires answering a threshold question: does the "challenged regulation address[] a general societal problem that has persisted since the 18th century," or does it address "unprecedented" societal concerns that "were unimaginable at the founding"? 597 U.S. at 27-28. If the former, the government must establish a historical tradition of "*distinctly* similar" regulations. *Id*. at 26 (emphasis added). This "relatively simple" and "straightforward historical inquiry" requires the government to identify a tradition of founding-era statutes that are nearly the same as the challenged regulation. *Id*. at 27-28. By contrast, the government can identify a tradition of "*relevantly* similar" historical analogues if, but only if, the challenged statute targets a problem unfamiliar to the founding generation. *Id*. at 29 (emphasis added).

The government denies this dual-track review. GB 64.  The government is wrong. *Contrast Bruen*, 597 U.S. at 29-30 (establishing dual-track analysis).  It cites *Alaniz* for its misunderstanding arguing "the Supreme Court did not lay out a 'dual-

20

track' standard with a stricter test for statutes aimed at long-standing problems." GB 64.

*Alaniz* reviewed the constitutionality of the drug sentencing guideline enhancement for possessing a firearm, U.S.S.G. § 2D1.1(b)(1). The Court recognized a drug offense is "a largely modern crime. It is animated by unprecedented contemporary concerns regarding drug abuse and is not closely analogous to founding era smuggling crimes". 69 F.4th at 1129. The Court thus analyzed the issue under the "relevantly similar" standard. *Id*.

The government does not dispute that felons' access to firearms, the problem to which § 922(g)(1) is addressed, has existed since before the founding, meaning the more-rigorous "distinctly similar" test applies. The government does not – because it cannot – claim there were any founding-era statutes distinctly similar to § 922(g)(1). The government nonetheless attempts to carry its *Bruen*-step-two burden by showing that § 922(g)(1) is "*relevantly similar*" to historical regulations. GB 60 (emphasis in GB). And, the government tries to circumvent the governing and more-demanding test by arguing it "need only identify a 'historical *analogue*, not a historical *twin*.'" GB 62 (quoting *Bruen*, 597 U.S. at 29 (emphasis in *Bruen*)). But the "twin" language appears in *Bruen*'s discussion of the "more nuanced" "relevantly similar" standard. *Bruen*, 597 U.S. at 30.

21

In doing so, the government implicitly concedes it cannot satisfy the controlling "distinctly similar" test. That ends the inquiry.

2. Even assuming the "relevantly similar" test applies, the government fails its burden.

Assuming the "relevantly similar" standard applies, the government still has failed to carry its burden.

a. Death penalty and forfeiture.

The government maintains that capital punishment and forfeiture of estate punishment around the time of the founding support disarming all felons, including Mr. Butts. GB 40-41, 52. After alluding to forfeiture of estate, the government briefs it sparingly, GB 52, and it never explains how forfeiture of estate equates to permanent disarmament under criminal penalty.

Turning to purportedly analogous Founding-era regulations, the government argues that because, according to William Blackstone, a "felony" was defined in 18th century England as an offense resulting in total forfeiture of property and capital punishment, today's "felonies" can permissibly be punished with the lesser penalty of dispossession of the right to bear arms. GB 51.

The government's argument is circular and self-defeating, as it relies on a "felony" being defined as a capital crime. But that is not today's definition of "felony." *See* 18 U.S.C. § 3581(b); 18 U.S.C. § 922(g). And under the government's

22

reasoning, "felonies" for which death is not authorized also don't justify the lesser penalty of permanent dispossession.

Moreover, in the Founding-era colonies, the definition of "felony" had already shifted from Blackstone's punishable-by-death to something less severe, where very few felonies were punishable by death. *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) ("During the period leading up to the founding, the connection between felonies and capital punishment started to fray.… [C]apital punishment in the colonies was used 'sparingly.'" (quoting Lawrence M. Friedman, Crime and Punishment in American History 42 (1993) (Ex. 2)). As Founding Father and later Supreme Court Justice James Wilson explained, although the term "felony" was "connected with capital punishment," "[a]t the common law, few felonies … were [actually] punished with death." 2 The Works of James Wilson 348 (James D. Andrews ed., 1896). The First Congress itself defined 18 federal crimes, with only eight punished by death. Cong. Ch. 9, April 30, 1790, 1 Stat. 112.

The government does not identify any Founding-era historical precedent for permanently disarming individuals convicted of capital (or non-capital) offenses where, as here, the person was not sentenced to death. That would be the appropriate historical analogue. Obviously, those on death row do not have the right to possess

a firearm. But Mr. Butts did not receive a capital sentence. He served his time and reentered society.

Under *Bruen*'s "relevantly similar" requirement, to justify § 922(g)(1)'s application here, the government must identify a well-established and representative historical analogue for depriving someone like Mr. Butts of his right to possess a firearm, not someone on death row. *Cf. Kanter*, 919 F.3d at 462 (Barrett, J., dissenting) ("The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.").

Moreover, a Founding-era felon sentenced who was not executed "could 'repurchase arms' after successfully completing his sentence and reintegrating into society." *Range*, 69 F.4th at 105. One key Founding-era statute even required prior felons to keep arms: the Militia Act of 1792, enacted just after the Second Amendment, required "each and every" free, able-bodied white male citizen between 18 and 45 to arm himself "with a good musket or firelock" – with no exceptions for prior felons. Act of May 8, 1792, § 1, 1 Stat. 271.

   b.   <u>Racist and anti-Catholic disarmament.</u>

The government turns to ethnic and anti-papist, as well as Loyalist, disarmament to extrapolate that legislatures have the power and discretion to rely on

24

status alone to disarm. GB 54-58. The government believes such laws establish that legislatures were understood to decide a non-violent offender can be excluded from the people and disarmed. GB 58. That reasoning collapses under its own weight: slaves, Indians, Catholics and Loyalists were not disarmed because of their offender status, but instead because of their race, ethnicity, religion, and political views.

Founding era governments disarming groups perceived as disloyal and potentially existential threats to the state "does nothing to prove that [someone like Mr. Butts] is part of a similar group today." *Range*, 69 F.4th at 105. "[A]ny such analogy would be 'far too broad.'" *Id*. (quoting *Bruen*, 597 U.S. at 31).

The government cites a 1689 English statute and a 1756 Virginia statute prohibiting Catholics from possessing firearms. GB 53-54. Those laws and § 922(g)(1) do not "impose a comparable burden on the right of armed self-defense." *Id*. at 29. Unlike § 922(g)(1), which imposes a categorical, permanent ban on firearm possession, the English and Virginia statutes permitted Catholics to retain their arms as long as they reformed and swore allegiance. GB 53-54. And the Virginia law, unlike § 922(g)(1), contained a self-defense exception, allowing disarmed Catholics to possess firearms "'for the defence of his house or person.'" *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

The "purpose" of the Catholic-disarmament statutes was "to preclude armed insurrections" and rebellion by a group considered "disloyal and seditious." *Id*. at 258-60, 263. And in any event, these two laws do not add up to a "well-established and representative historical" tradition. *Bruen*, 597 U.S. at 30. The *Bruen* Court "doubt[ed]" that regulations from three out of thirteen colonies were sufficient to establish a historical tradition. *Id*. at 46. It necessarily follows that inapposite regulation from a single colony, plus a law from 17th-century England, are also inadequate.

The government also points to "several" colonial laws banning gun ownership by slaves and Native Americans. GB 54. But "neither slaves nor Indians were understood to be a part of the 'political community' of persons protected by the Second Amendment," *United States v. Harrison*, 654 F.Supp.3d 1191, 1216 (W.D.Okla. 2023). Restrictions on their gun rights tell us nothing about the scope of arms-bearing permitted to those who were among "the people." *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) ("Neither the Indian nor the slave was a citizen of the British colonies and, accordingly, neither was entitled to the rights of English subjects.").

The Solicitor General agrees. During Supreme Court oral argument, the government conceded "those categories of people were viewed as being not among

26

the people protected by the Second Amendment". Transcript of Oral Argument at

7, *United States v. Rahimi*, No. 22-915.

At least one judge has criticized the government's reliance "on this nation's

history of explicit discrimination against racial and ethnic minorities to support

Section 922(g)(1)'s constitutionality." *United States v. Griffin*, 2023 WL 8281564

at *5 (N.D. Ill. 2023). That court was "dismayed by the government's continuous

reliance on admittedly bigoted and racist laws in these cases." *Id*. at *6. The court

ultimately "reject[ed] the government's reliance on slavery and discrimination

toward Native Americans as historical analogues to Section 922(g)(1) given the

regulations impermissible premise cannot impose a 'comparably justified' burden

on the right of armed self-defense." *Id*.

    c.    <u>Loyalist disarmament</u>.

The government cites Revolution-era laws targeting Loyalists. These statutes

and § 922(g)(1) do not impose a "comparable burden" on the right to keep and bear

arms. *Id*. at 2133. People disarmed under loyalty statutes could regain the arms right

at any time simply by swearing a loyalty oath, *see* Robert H. Churchill, *Gun

Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law

& Hist. Rev. 139, 157 (2007), whereas § 922(g)(1) defendants have no similar ability

to restore their own right to arms via swearing allegiance. And even when states took

27

arms away from someone who refused the oath, that person was free to acquire new, additional firearms – unlike a § 922(g)(1) defendant. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 724 (2009) (loyalty statutes "did not technically prohibit recusants from acquiring new arms," since they "read more like forfeiture laws than disabilities").

The loyalty statutes were meant to neutralize those "considered dangerous to the state," i.e., those who might rebel or otherwise undermine the stability of government because of their loyalty to Great Britain. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-07 (2004) (emphasis added); *see* Greenlee, 20 Wyo. L. Rev. at 265 ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them."). Loyalty statutes are not "comparably justified" to permit disarmament of felons. *Bruen*, 597 U.S. at 30.

  d. <u>Rejected proposals from the Second Amendment's drafting history do not satisfy the government's burden to identify a relevantly similar "tradition of regulation</u>.".

The government notes that a proposal at the constitutional ratifying convention in Pennsylvania would have enshrined the right to bear arms, "unless for crimes committed." GB 58.  It also references a similarly defeated proposal in Massachusetts.  GB 59.  These proposals are irrelevant for several reasons.

Most obviously, they were never adopted. *Contrast Bruen*, 597 U.S. at 24, 26, 29 (requiring similar tradition of regulation). As then-Judge Barrett pointed out, "none of the relevant limiting language made its way into the Second Amendment." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). And, as *Heller* warned, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." 554 U.S. at 590. The *Heller* majority, in fact, scolded the dissent for consulting "the drafting history of the Second Amendment – the various proposals in the state conventions and the debates in Congress" – to interpret the Second Amendment. *Id*. at 603.

Reliance on such sources is "dubious," because the Second Amendment "was widely understood to codify a pre-existing right, rather than to fashion a new one." *Id*. That reliance is particularly dubious here: the fact that the Pennsylvania and Massachusetts proposals' limiting language were minority proposals, rejected by the state conventions, indicates, if anything, that the public did not believe the arms right should be limited "for crimes committed."

In addition to Pennsylvania and Massachusetts, delegates to the New Hampshire ratifying convention approved a proposed constitutional amendment providing that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting). The

29

government nonetheless relies on this proposal, even though excluding from the arms right those who participated in "actual rebellion" is not "similar" to § 922(g)(1)'s categorical ban on firearm possession by people convicted of any felony. Regardless, the New Hampshire proposal, like those from Pennsylvania and Massachusetts, did not end up in the Second Amendment, so it is equally irrelevant.

Nowhere in its response does the government identify any historical regulation restricting – much less prohibiting, permanently and under pain of criminal punishment – the ability of felons to possess firearms. No statutes. No ordinances. No precedent. Nothing. Instead, the government offers a smattering of "for instances" from sources that, upon closer inspection, come nowhere close to identifying a relevantly similar tradition of regulation under *Bruen*.

## II.    As applied, § 922(g)(1) violates Mr. Butts' Second Amendment rights.

As applied challenges are fact-driven, as the Court knows well. "[A]n as-applied challenge is wholly fact dependent[.]" *Young*, 992 F.3d at 779 (quoting Henry Paul Monaghan, Overbreadth, 1981 Sup. Ct. Rev. 1, 5). The government is thus wrong to claim Mr. Butts devoted only three-pages to his as-applied challenge. GB 65. *Contrast* OB 5-13, OB 60-62 (relying on undisputed facts to argue as-applied challenge).

The government agrees the Second Amendment permits possession of firearms in a citizen's home for hunting, but claims that right is limited to law-abiding responsible citizens.  GB 66.

The government ignores the district court's repeated and extensive fact-finding regarding Mr. Butts' current character, none of which the government disputed.  Mr. Butts "successfully participated in supervised release", and "abided completely, in every respect, by the [pretrial release] conditions that were set by the Court".  ER 34-35.

The government ignores the district court's sporting exception fact-finding, to which the government did not object, that there is no evidence the firearms possessed by Mr. Butts were used for "anything other than sporting purposes" and that is not "a significant serious offense." ER-35–36.  Indeed, there was extensive, undisputed evidence the guns were possessed for hunting.  ER-146-148, 150-151, 155-156, and 158-161.  *Contrast Alaniz*, 69 F.4th at 1129-30 (weapons possessed during commission of a crime).

The government ignores the district court's fact-finding that Mr. Butts "has a respect for the law" and that "his personal history[] reflect[s] someone who is likely a good citizen".  ER-36.  Instead, the government labels Mr. Butts a non-law-abiding-irresponsible citizen.  GB 66.

For the first time, the government tries to attack Mr. Butts' reason for possessing the firearms as merely claimed to be for hunting. GB 66. That qualifier ignores the government's agreement the Guidelines sporting exception applied. ER-35–36. The sporting exception requires the defendant "possessed all ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition[.]" U.S.S.G. § 2K2.1(b)(2). The government agreed Mr. Butts possessed the firearms for hunting, and thus the sporting exception applies. ER-35–36. Mr. Butts never unlawfully discharged and never unlawfully used the hunting firearms. Moreover, the government never disputed the extensive sworn evidence that the guns were for hunting. ER-146-161.

In response to these undisputed hunting possession facts, the government's agreement the Guidelines sporting exception applied, and the district court's undisputed fact-finding regarding Mr. Butts' character, the government cites to a 1652 forfeiture law in New Netherland and a 1904 law in North Carolina to disarm Mr. Butts as a non-law-abiding responsible citizen. GB 66 n. 24. Forfeiture laws over 100 years before and after the founding do not meet the government's burden. *Bruen*, 597 U.S. at 41, 66.

The government presents Mr. Butts' State of Montana conviction as dangerous. GB 67-68. It is not categorically a crime of violence. *Compare United States v. Fetters*, 2014 WL 7272653, *3 (D. Mont. 2014) (identifying "criminal endangerment" as crime of violence under then-current U.S.S.G. §4B1.2(2)'s "residual clause") and U.S.S.G. Manual, App. C., Reason for Amendment 798 (removing "residual clause" from U.S.S.G. 4B1.2 as "implicating" due process concerns). The government wants to retry the facts of that case, unnecessary to establishing the elements for a 20-year-old conviction. PSR ¶ 40.

Moreover, the phrase "law abiding" is a present participle, describing current or ongoing compliance with the law. The district court found, without objection from the government, that is exactly what Mr. Butts is doing now, 20 years removed from the conviction on which the government bases its characterization of Mr. Butts.

Furthermore, the government ignores that it charged Mr. Butts' false statement offense as the predicate felon prohibiting Mr. Butts' firearm possession. ER-163. As Mr. Butts briefed previously, a false statement is non-violent and analogous to the offense in *Range*.

The government completely ignores undisputed facts: Mr. Butts possessed undisputed hunting firearms for undisputed hunting purposes and the district court found he has a respect for the law, is likely a good citizen, and the public does not

need to be protected from him. As applied, § 922(g)(1) violates Mr. Butts' Second Amendment rights.

## CONCLUSION

The Court should reverse the district court's order denying Mr. Butts' motion to dismiss and remand to the district court for further proceedings.

RESPECTFULLY SUBMITTED this 1st day of February, 2024.

SHAWN LEE BUTTS

By:  */s/John Rhodes*
JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
Counsel for Defendant

34

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this Reply Brief of Defendant-Appellant is in compliance with Ninth Circuit Rule 32(a). The Brief's line spacing is double spaced. The brief is proportionately spaced, the body of the argument has a Times New Roman typeface, 14 point size and contains less than 7,000 words, including footnotes and quotations. (Total number of words: 6,999, excluding tables and certificates).

DATED this 1st day of February, 2024.

SHAWN LEE BUTTS

By:     */s/John Rhodes*
        JOHN RHODES
        Assistant Federal Defender
        Federal Defenders of Montana
            Counsel for Defendant

## CERTIFICATE OF SERVICE
### Fed.R.App.P.25

I hereby certify that on February 1, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

Participants in the case who are registered ACMS users will be served by the appellate ACMS system.

I further certify that some of the participants in the case are not registered ACMS users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party carrier for delivery within 3 calendar days, to the following non-ACMS participants:

SHAWN LEE BUTTS
276 Beaver Lake Road
Whitefish, MT 59937

Defendant-Appellant

/s/John Rhodes
JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
        Counsel for Defendant